(No. 47583.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant,
v. ENICH CHANEY, Appellee.

*Opinion filed March 29, 1976.—Rehearing denied May 27, 1976.*

UNDERWOOD, J., WARD, C.J., and RYAN, J., dissenting.

William J. Scott, Attorney General, of Springfield, and Bernard Carey, State's Attorney, of Chicago (James B. Zagel and Jayne A. Carr, Assistant Attorneys General, of Chicago, and Laurence J. Bolon, Donald M. Devlin, and Linda Ann Miller, Assistant State's Attorneys, of counsel), for the People.

Allan A. Ackerman and George C. Howard, both of Chicago (Ackerman, Durkin & Egan, and Steven M. Levin (law student), of counsel), for appellee.

MR. JUSTICE KLUCZYNSKI delivered the opinion of the court:

On January 6, 1971, defendant, Enich Chaney, was indicted on charges of burglary, aggravated assault and attempt murder. Following a jury trial in the circuit court of Cook County, he was convicted of these offenses. The common law record recites that defendant was sentenced to the penitentiary for a term of 8 to 24 years for burglary, 8 to 20 years for aggravated assault and 8 to 20 years for attempt murder. The sentences were to run concurrently. While the transcript of the sentencing proceedings is in accord with the burglary and attempt murder sentences, it discloses that the trial court did not

impose a sentence for aggravated assault. The appellate court reversed and remanded the cause for a new trial or for other appropriate proceedings. It held that the invocation of the informer privilege by the State and the trial court's action in sustaining State objections to defense questions designed to elicit the identity of a police informant created prejudicial error which deprived defendant of a fair trial. (*People v. Chaney,* 27 Ill. App. 3d 366.) We granted the State's petition for leave to appeal.

The facts of this case are greatly disputed. The principal evidence of the defendant's involvement in the crimes was supplied by several police officers. The defendant contended that he had been "set up" by the police, and to support his testimony to this effect he called his mother and Charles Holt.

Sergeant William Higgins testified that late in the evening of January 3, 1971, he received a telephone call from an informant he apparently had not previously known. Higgins and another officer met the informant at a restaurant located near Division and Clark Streets in Chicago, where they had a conversation; then they proceeded to a building located at 1300 Lake Shore Drive. There they entered the apartment of Ralph Applegate and inspected the premises.

The next morning Higgins and seven other officers returned to the building. Two officers remained outside and officers Vollick and Marino positioned themselves near the lobby in the manager's office. Sergeant Higgins and officers Erickson, Collins and Muscalino accompanied the manager to the Applegate apartment. The manager apparently admitted the police and then departed.

In summary the testimony of Higgins, Collins and Erickson basically indicated that they received a message by radio from the officers stationed outside the building that the suspects' vehicle was in the area. The officers near the building lobby then indicated that the suspects had entered an elevator. The officers in the apartment posi-

tioned themselves so as to conceal their presence. Shortly thereafter they heard a scraping noise of metal on metal at the doorway of the apartment. The door was opened, and defendant entered followed by an unidentified individual. The police announced their office and defendant stated that he lived there. Higgins rushed toward defendant, who turned to face Higgins with a gun in his hand. A scuffle ensued to wrest the weapon from defendant. Collins was knocked to the floor with defendant during the struggle, and, he said, he then kicked defendant in an effort to extricate himself. Erickson testified that he struck defendant on the head several times with his pistol in order to subdue him, and after the fight he noted defendant was bleeding from his forehead. The accomplice may have escaped by means of a stairway as the two officers stationed near the lobby were using the elevator to reach the apartment. Collins admitted that after the arrest he learned that defendant was under investigation for murder.

It was during the testimony of Officer Collins that the question of the informant's identity was initially raised. The State's objection to disclosure of the identity was sustained. Thereafter, during cross-examination of Sergeant Higgins, the defense probed the circumstances surrounding Higgins' encounter with the informant. Higgins was asked if the informant told police who might accompany defendant the next morning during the burglary. Both Higgins and the prosecution expressed the view that to answer the question would reveal the informant's identity. The trial court sustained the objection but then permitted the witness to answer the question after it became apparent that the answer did not pose a danger of revealing the identity.

Following his arrest defendant was taken to a hospital where he was treated for his injuries. He was then taken to the police station where he said Charles Holt was the man who was with him that morning. Holt was brought to the station. When defendant saw Holt, the former asked Holt

to tell the police that both had gone to the building to visit several girls. At this time Holt denied being with defendant.

Officer Marino knew Holt before the incident in question. Marino had viewed defendant and the other man in the lobby during the police "stake-out." He said Holt was not the unidentified individual with defendant.

A screwdriver was found near the front door of the apartment which bore particles similar to those taken from the doorway of the apartment. Photographs of the apartment door show substantial damage near the lock mechanism. The automatic pistol purportedly taken from defendant contained several bullets.

Defendant's mother testified that about one week before the incident in question Sergeant Higgins and seven other officers burst into her apartment in the early morning hours looking for weapons. She identified officers Bendis, Collins and Vollick as several of these participants in the raid. As a result of this incident she complained to the Internal Affairs Division of the police department. She further recounted that the previous summer Higgins was present when other police officers told her to have her son leave town or he was going to be killed.

Defendant denied any participation in the crimes charged. He testified that the day before the alleged burglary he met Holt, whom he had known for two years, at Holt's place of employment, where they had a conversation about visiting some girls. The next morning Holt met defendant at his mother's apartment and they proceeded in defendant's car to 1300 Lake Shore Drive. They entered the elevator to go to the 34th floor, but the elevator stopped at the 28th floor. As the doors opened defendant was confronted by police officers who ordered him off the elevator and pushed him into a room where Higgins was said to have told defendant, "See, Chaney, I can kill you right now if I wanted." Another officer purportedly threatened defendant with a sword which had been taken

from a box in the apartment. Defendant also saw a gun taken from the box, which apparently was the weapon introduced against him at trial. Defendant said Higgins began to beat him with a large blackjack and the other officers kicked and beat him for 30 minutes until Officer Marino urged them to stop. As he left the building in police custody, defendant said that Higgins threatened to kill him if he "beat" the charge or when he was released from the penitentiary. Defendant said he was beaten on the legs and required hospitalization for his injuries for several months until his release on bail in May 1971.

Pursuant to the State's motion for pretrial discovery the name of Charles Holt was contained on a list of possible defense witnesses given to the State in November 1971, seven months before trial. After defendant had testified, Holt was called as a defense witness. Holt testified that he had been acquainted with defendant for nine years. On January 4, 1971, he and defendant went to 1300 Lake Shore Drive and they got off the elevator on the 28th floor. They went to the door of the Applegate apartment only to discover they were not at the right apartment. As they reentered the elevator, they were confronted by police. Holt said he fled down the stairs and returned to work. He was later placed in custody by police and taken to the police station where he signed a statement.

On cross-examination the State laid the foundation to impeach Holt by means of his prior inconsistent signed statement given to police on the afternoon of January 4, 1971. Holt admitted he had signed the statement but denied he had contacted Sergeant Higgins the night before the burglary to reveal defendant's plan or informed anyone of the plan. The State produced the three-page statement and, after the defense examined it, defense motions for a mistrial or to treat Holt as a hostile witness were denied. Holt was then examined concerning the contents of the statement. He denied he had made that portion of the

statement which indicated he had informed Sergeant Higgins of defendant's plan, but he did concede that he had said he would accompany defendant "on the burglary *** but only to get information out of him." He denied having stated that if he did take part in the burglary that he "was to duck out some way." And he further denied the contents of the statement wherein he purportedly said that defendant met him the morning of the burglary and he refused to go with defendant to the building. But Holt did concede that he had told police he was not with defendant that morning and that defendant said that he was present because defendant "may have figured that I was the one who gave out the information that got him arrested." When queried on that part of the statement which stated he knew defendant was carrying a gun, Holt denied the matter.

Holt admitted he had been convicted of burglary and theft. It is to be gathered from the record that at the time he testified he was being tried before another court on an unrelated robbery charge.

In rebuttal the State recalled several police officers who disputed defendant's testimony relating to the source of the weapon. Sergeant Higgins further testified that Holt had made the statements attributed to him. And Officer Bendis testified that none of the officers who testified against defendant participated in the occurrence at the home of defendant's mother. Prisoner records were also introduced which indicated that defendant, in fact, had been hospitalized from January 4 through January 8, 1971, at the county jail hospital but then released upon his own request and placed on a tier in the jail where prisoners would be normally assigned. Finally, at defendant's request, Holt's written statement was admitted into evidence.

During arguments on post-trial motions defense counsel informed the court that he had spoken to Holt prior to

trial and the latter had lied to counsel about his participation with the police. Counsel further said that the defense believed Holt to be the informer but this could not be proven. Finally, counsel expressed surprise that Holt had given such a detailed statement to the police concerning his activities and asserted that, had the defense initially been aware of the statement's substance, it could have asked the trial court to immediately declare that Holt was a hostile witness.

The State raises a multi-faceted argument to support its position that its nondisclosure of Holt as the informant was not prejudicial error. The State maintains that it properly answered defendant's motion for pretrial discovery relating to the latter's request for "a list of witnesses that the State may or may not call upon trial of this cause" and "production *** [of] *** documents *** which are relevant or material to the case for the defense, or for the State in this cause." It predicates this argument on the assertions that it never contemplated calling Holt as a State witness; and that Holt's signed statement "served to inculpate the defendant and that this statement, therefore, was not relevant or material to the defense." Furthermore, the State takes the position that Holt's statement was offered to impeach Holt and not as substantive evidence against defendant.

Secondly, the State argues that it did not transcend the dictates of *Brady v. Maryland,* 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194. The State characterizes the information regarding Holt's statement and his identity as the informer as evidence which would not tend to exculpate the defendant or reduce his punishment and argues therefore that the State's failure to disclose was not violative of *Brady.*

Finally, the State suggests that Holt's identity was validly withheld under the informer's privilege. (Ill. Rev. Stat. 1973, ch. 110A, par. 412(j)(ii).) And, even if the

defendant had a right to disclosure, the State says that defendant knew prior to trial that Holt was the informant and that he had given a statement to the police.

In *Moore v. Illinois,* 408 U.S. 786, 33 L. Ed. 2d 706, 92 S. Ct. 2562, the United States Supreme Court explained its holding in *Brady v. Maryland.* It said:

> "The heart of the holding in *Brady* is the prosecution's suppression of evidence, in the face of a defense production request, where the evidence is favorable to the accused and is material either to guilt or to punishment. Important, then, are (a) suppression by the prosecution after a request by the defense, (b) the evidence's favorable character for the defense, and (c) the materiality of the evidence." (408 U.S. 786, 794-95, 33 L. Ed. 2d 706, 713, 92 S. Ct. 2562, 2568.)

While the defendant could be said to have requested the information which was material to his position, we do not believe that Holt's statement was of a "favorable character for the defense." Under the circumstances we do not believe that the State's failure to proffer the statement was contrary to the dictates of *Brady v. Maryland.*

The next question pertains to the extent to which the State may invoke the informer's privilege within the factual context of this case. Our discussion must begin with consideration of *Roviaro v. United States,* 353 U.S. 53, 1 L. Ed. 2d 639, 77 S. Ct. 623. In that case the informant's identity was successfully concealed by the prosecution both before and during trial. The evidence disclosed that the informant had actively participated in the drug purchase. In reversing the conviction the Supreme Court recognized the government's interest in utilizing a method whereby information on criminal activities might be proffered by a citizen without disclosing his identity and subjecting himself to risk of harm. But the court recognized that this privilege was not absolute. The court

noted that, if the contents of a communication would not disclose the informant's identity, then a privilege of withholding the contents of the communication is not applicable. And, if the identity has already been disclosed "to those who would have cause to resent the communication, the privilege is no longer applicable." (353 U.S. 53, 60, 1 L. Ed. 2d 639, 645, 77 S. Ct. 623, 627.) The court further limited the scope of the privilege in the fundamental interest of fairness stating:

"*** Where the disclosure of an informer's identity, or the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way.

* * *

We believe that no fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors." 353 U.S. 53, 60-62, 1 L. Ed. 2d 639, 645-46, 77 S. Ct. 623, 628-29.

Cases following *Roviaro* have required disclosure of the informant when he also participated in the commission of the offense for which a defendant is charged and the testimony of the key prosecution witness remains otherwise uncorroborated. (*People v. Lewis,* 57 Ill.2d 232; *United States v. Barnett* (6th Cir. 1969), 418 F.2d 309.) Other decisions have suggested disclosure of an informant's identity when the informant helps to set up the criminal occurrence or is a witness thereto (*McLawhorn v. State* (4th Cir. 1973), 484 F.2d 1; see *People v. Beattie,* 31 Ill.2d

257), and not merely a tipster who gives information to the police (*United States v. James* (D.C. Cir. 1972), 466 F.2d 475; see *United States v. Miller* (10th Cir. 1974), 499 F.2d 736; *United States v. Gibbs* (9th Cir. 1970), 435 F.2d 621, *cert. denied,* 401 U.S. 994, 28 L. Ed. 2d 532, 91 S. Ct. 1233).

It has been held that no error occurred where the prosecution asserted the informer's privilege to prevent disclosure of the identity of an informant who is an eyewitness to the arrest and participated in the commission of the offense, and who is called as a defense witness. (*State v. Tisnado* (1969), 105 Ariz. 23, 458 P.2d 957; *cf. United States v. Miller* (6th Cir. 1974), 499 F.2d 736.) However, Supreme Court Rule 412(j)(ii) (Ill. Rev. Stat. 1973, ch. 110A, par. 412(j)(ii)) provides that "Disclosure shall not be denied hereunder of the identity of witnesses to be produced at a hearing or trial."

The present case involves a balancing of the interest of the State in protecting an informant's identity with that of the defendant to a fair trial. We do not believe that the State's failure to comply with defendant's general request for discovery filed many months before trial was violative of defendant's rights. At that juncture and up to the time of trial, the State was under the impression that Holt was not a participant in the crime as evidenced by the substance of his oral and signed statements as well as Officer Marino's testimony that Holt was not the unidentified individual who entered the elevator with defendant. Under these circumstances and in view of the fact defense counsel made no pretrial motion directed specifically toward information concerning an informant, the mere listing of Holt as a possible defense witness did not give rise to a duty of disclosure upon the State. To hold otherwise would require the State to disclose the informant or to strongly suggest his identity by objecting to a general defense motion for pretrial discovery, thereby

possibly endangering the informant's safety, particularly when only two defense witnesses have been listed.

In striking the proper balance under the facts of this case between the informer's privilege and defendant's right to a fair trial, we believe when it became apparent that Holt was actually going to be called by the defense, it was incumbent upon the State to inform the court prior to Holt's direct examination of the fact he was the informant and to disclose the existence of his prior signed statement. It is unreasonable to assume that the defendant, whose testimony would have otherwise remained uncorroborated, contemplated calling Holt as his witness unless Holt had previously indicated that he would testify favorably for the defense. The State was in the position of allowing Holt to testify as a defense witness with the realization that it possessed his prior signed statement which cast serious doubt on the veracity of his testimony. The State utilized this advantage to full potential during cross-examination of Holt and in closing argument to the jury when it told the jury that Holt was called as a witness by defendant, who therefore vouched for his credibility.

We further are of the opinion that the State's failure to inform the defense of Holt's status prior to his direct testimony constituted prejudicial error under the facts of this case. And, while the State has maintained that the defense previously knew Holt was the informant, this conclusion is not convincingly established by the record.

This case does not present a situation whereby the activity of the State may be categorized as misconduct giving rise to the possibility that the charges should be dismissed as defendant has suggested. Rather, this cause should be remanded to the circuit court for a new trial.

Accordingly the judgment of the appellate court is affirmed.

*Judgment affirmed.*

MR. JUSTICE UNDERWOOD, dissenting:

I cannot agree with the majority for several reasons. First, its opinion is predicated upon the assumption that defendant was not aware that Holt was the informer. To me, the clear import of the record before us is to the contrary and that the defendant knew before trial that Charles Holt had been cooperating with the police and was the informant. That conclusion seems to me inescapable from the opening statement of defense counsel, which is in part:

> "We expect the evidence to show that the police believe that Enich Chaney committed that crime, that he was the trigger man in a murder case.
>
> We expect the evidence to show further that the police officers, having no evidence with respect to this murder case, elected thereafter to frame Mr. Chaney, to 'set him up.'
>
> We expect the evidence to show that on the date of this alleged offense, January 4, 1971, that Enich Chaney was lured to a building in the City of Chicago located at 1300 North Lake Shore Drive by a person he knows by the name of Charles Holt.
>
> We expect the evidence to show that Charles Holt and Enich Chaney, together with one Frank Trabeau, went to this building at 1300 North Lake Shore Drive, where Charles Holt worked as a car-hop picking up cars and bringing them back to the tenants.
>
> We expect the evidence to show that Charles Holt told Enich Chaney, 'I know some nice girls up on 34, and I will take you up there. They want a party.'
>
> I expect the evidence to show that Enich Chaney did indeed fall for the lure, did indeed go to 1300 North Lake Shore Drive, and that when the elevator stopped at 28, not at 34, as he had been led to believe, the doors opened and Chaney was greeted at that point by the police; that the police officers had indeed staked out the 28th floor of 1300 North Lake Shore Drive, but that the police officers had told Charles Holt to bring Enich Chaney to these premises ***."

If, as I believe, the defense was aware before trial of Holt's status, it is scarcely realistic to believe that any real

prejudice to defendant resulted from the State's refusal to verify that fact.

Secondly, the value of informants to law enforcement officers and the importance of not revealing their identity except under compelling circumstances has been repeatedly emphasized by this court. (See 58 Ill.2d R. 412(j)(ii), Committee Comments; *People v. McCray* (1965), 33 Ill.2d 66, *aff'd, McCray v. Illinois* (1967), 386 U.S. 300, 18 L. Ed. 2d 62, 87 S. Ct. 1056; *People v. Durr* (1963), 28 Ill.2d 308.) In the circumstances here, where the strong probability, if not virtual certainty, is that defendant already knew the informant's identity, and where it is not entirely clear that the informer was even at the scene of the crime, the argument for disclosure of his identity in my opinion is not at all persuasive.

Thirdly, the majority conclusion that not only is disclosure of identity required but that the informer's statement to the police should also have been furnished defendant is, as I view it, simply not supportable. That statement was decidedly unfavorable to defendant, and nothing in *Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194, requires that it be given defendant. Our criminal discovery rules require only that the State deliver requested statements of witnesses whom it intends to call (58 Ill.2d R. 412(a)(i)), and the State had no intention of calling Holt as its witness. Thus, in my judgment, even were disclosure of Holt's identity to be required, disclosure of his statement was not.

I would reverse the appellate court and affirm the conviction.

WARD, C.J., and RYAN, J., join in this dissent.