James Carl BAKER, Appellant,

v.

STATE of Missouri, Respondent.

No. 60810.

Supreme Court of Missouri,
En Banc.

May 17, 1979.
Dissenting Opinion May 31, 1979.
Rehearing Denied June 19, 1979.

John L. Pursley, McNabb & Pursley, Butler, for appellant.

John D. Ashcroft, Atty. Gen., Paul R. Otto, Asst. Atty. Gen., Jefferson City, for respondent.

RENDLEN, Judge.

This is a post-conviction relief proceeding under Supreme Court Rule 27.26. After a jury found James Carl Baker guilty of first degree robbery by means of a dangerous and deadly weapon and of assault with intent to do great bodily harm with malice aforethought, the court imposed consecutive sentences of fifty years' imprisonment for the robbery and forty years for the assault. That judgment was affirmed in *State v. Baker,* 548 S.W.2d 572 (Mo.App.1975).

In 1976 Baker, by his original and twice-amended motion, sought to vacate the sentence alleging (1) erroneous charges in the information, (2) improper failure of the State to provide certain discovery material, (3) ineffective assistance of trial counsel, and (4) erroneous imposition of consecutive sentences. The State responded with its motion to dismiss and the trial court, ruling that there was "no issue of fact or law to be determined," sustained the State's motion to dismiss in 1977, without appointment of counsel or evidentiary hearing. The Court of Appeals affirmed and the cause was thereafter transferred here.

## I.

In November, 1978, two new requisites for Rule 27.26 proceedings were declared by this Court in *Fields v. State,* 572 S.W.2d 477 (Mo. banc 1978). *First*: That there be automatic appointment of counsel for indigent movants (now embodied in Rule 27.26(h), as amended December 14, 1978; see 34 J.Mo.Bar 550 [1978]). *Second*: The requirement, in exposition of Rule 27.-26(i), that findings of fact and conclusions of law be made on material issues presented by motions under the rule, irrespective of whether an evidentiary hearing is held. It left unchanged the requirement of Rule 27.-26 that the pleadings must state facts, not conclusions, which if true would entitle the movant to relief.

Examining the question of whether the rule changes announced in *Fields* might affect the proceedings at bar, it is clear they do not. The benefit of those procedural changes was granted to the movant in *Fields* because otherwise the principles announced would be only dictum, *see Stovall v. Denno,* 388 U.S. 293, 301, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), and because "it is customary to grant relief to the litigant whose case brought about the change . . . ." *Fields,* 572 S.W.2d at 483. However, it was stated explicitly in *Fields* that the changes made by it were prospective only. Accordingly, this case, tried prior to *Fields,* is governed by all the standards declared in *Smith v. State,* 513 S.W.2d 407, 411 (Mo. banc 1974), *cert. denied,* 420 U.S. 911, 95 S.Ct. 832, 42 L.Ed.2d 841 (1975). Thus neither the failure to appoint counsel nor to make specific findings of fact or conclusions of law was erroneous and for reasons hereinafter discussed the action of the trial court dismissing the motion was not clearly erroneous except as to the question of consecutive sentences.

Baker next contends [1] his trial was rendered fundamentally unfair by the State's failure to comply with his "motion for disclosure without court order" by failing to deliver a copy of Russell Baker's guilty plea hearing transcript prior to trial and the State's subsequent use of portions of that transcript to impeach Russell's credibility.

At the time of James Baker's trial, his brother Russell was in the state penitentiary; his presence at James' trial was secured by means of a writ of habeas corpus *ad testificandum.* There can be no question that James Baker knew Russell had been convicted as a participant in the crime for which he, James, was then standing trial. Russell had pled guilty to charges arising from his participation in the April 13, 1974, robbery of the Keil Jewelry Store in Clinton, the incident giving rise to the charges against James. In Russell's guilty plea hearing of July 3, 1974, he admitted under oath his participation in the robbery and implicated James as a co-participant. Under this Court's order of February 22, 1972, reprinted as an appendix to Supreme Court Rule 25.04, *see* 1974 Missouri Rules of Court 185 (West), a transcript of such guilty plea hearing was required to be filed with the circuit clerk within thirty days after the proceedings.

Prior to James Baker's trial, the defense filed a "motion for disclosure without court order" in which, among other things, the State was asked to supply "copies of all written or recorded statements and the substance of any and all oral statements made by the Defendant herein or by any Co-Defendant, . . ." The transcript of the criminal trial proceedings does not show any orders of court made on the subject nor does it reveal what, if anything, the State supplied defense counsel in response to the discovery request. There is no indication in the record that any statements from James Baker were ever taken by the State.

At movant's trial, Russell testified that at the time of the robbery his brother James was in Kansas City, and that Russell's partner in the crime was a man named Jerome Wiggman. On cross-examination, after laying the foundation, the prosecutor asked Russell the following question from the transcript pertaining to his guilty plea hearing:

"Q. Mr. Baker, isn't it a fact that . . that at that hearing where you entered your plea you were asked the following question:

'Q. Mr. Baker, if I may just reiterate this, let me tell you what the prosecutor's understanding of the situation is and you can tell me whether or not this is correct.

It is my understanding that on the 13th day of April, 1973, excuse me, 1974, in Henry County, that you and James Baker went into the Keil Jewelry Store in Clinton, Missouri; that you shot Mr. Kemper, as we have stated, because you felt he was stalling you or delaying you, you then went to the back of the store, took watches and rings from the store and left with him still in the back, is that your understanding?

'A. Yes.' "

Assuming *arguendo* the State's failure to deliver the transcript of Russell's guilty plea hearing, we must bear in mind that post-conviction proceedings under Rule 27.-26 are designed to cure denials of fundamental rights. For reasons we now discuss, movant's complaint, if worthy at all, involves nothing more than mere trial error. The transcript of Russell's guilty plea was part of the circuit court's records in St. Clair County, which adjoins Henry County (where the charges were filed) and Bates County (where the trial was moved on a change of venue). That record was equally available to the defense and the prosecution. For this reason alone movant has no valid argument that the State was required to deliver that record to him. Furthermore, independent of the transcript's availability, the State had no constitutional duty to deliver Russell's plea transcript to the de-

1. Baker's motion and its subsequent amendments raise many other issues not preserved for appellate review; thus they are not considered here.

fense. The applicable law is found in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *Moore v. Illinois,* 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972). Under those cases the prosecution must disclose any information requested by the defense if it is *favorable to the defense* and material to the guilt or punishment of the accused. Here the transcript of the brother's guilty plea was not *favorable* to the defense as it showed movant participated in the crime. Whatever may have been the value of the transcript in the preparation of movant's trial strategy, it was not favorable to the *Brady* sense and no denial of movant's right to a fair trial occurred. *See United States v. Randolph,* 456 F.2d 132 (3d Cir.), *cert. denied sub. nom. Waller v. United States,* 408 U.S. 926, 92 S.Ct. 2507, 33 L.Ed.2d 337 (1972); *People v. Chaney,* 63 Ill.2d 216, 347 N.E.2d 138 (1976); *State v. McLean,* 1 Or.App. 147, 459 P.2d 559 (1969), *aff'd.,* 255 Or. 464, 468 P.2d 521 (1970).

We need not address a possible Rule 25.32 violation by the prosecution's alleged failure to provide the transcript of the brother's guilty plea in this case. Absent infringement of movant's right to fair trial, the matter may be deemed no more than trial error, not embraced by Rule 27.26.

### III.

■ Appellant's next contention of error contains several instances of alleged ineffective assistance of counsel. First, he alleges that counsel "failed to take a deposition from any of the State's witnesses and more specifically, failed to consult with the

witness, Russell Levi Baker, to determine what his prior testimony had been." Movant's contention may not be dismissed merely for failure to name witnesses to be interviewed; rather, it must be determined whether the motion sufficiently states the breach of counsel's duty to investigate before trial and the existence of substantial information not presented at trial because of counsel's dereliction of duty. *Jones v. State,* 491 S.W.2d 233 (Mo.1973). The motion failed because it did not point out what substantial information helpful to the defense was missing from trial because of counsel's alleged failure to investigate.[2] The claim as to additional witnesses, named later in the motion as Jack Reynolds, Tronky Theodoro, Ollie May Long and Donald O'Riley, whom counsel allegedly failed to interview, suffers the same deficiency.[3] This claim too was properly denied.

■ Movant's next allegation of ineffective assistance of counsel predicated error on counsel's alleged failure to request a continuance until the attendance of certain alibi witnesses could be assured. Apparently these are the witnesses to whom reference was made in the discussion immediately above. Movant's counsel presented five witnesses at the criminal trial, in addition to movant and his brother, whose testimony provided an alibi for movant. Once again, movant has made an assertion bare of any factual allegation to support his claim that counsel's failure to request a continuance resulted in a substantial deprivation of his right to a fair trial. *Sims v. State,* 496 S.W.2d 815, 817 (Mo.1973).

---

2. The motion's statement of facts in support of this claim includes a legal argument on the requirements for pressing this type of ineffectiveness assertion. Discussing *McQueen v. Swenson,* 498 F.2d 207, 220 (8th Cir. 1974), movant stated:

   Once it is shown, as it has been in this petition, that defense counsel breached an essential duty, the sufficiency of a petitioner's proof of prejudice turns on whether admissible evidence has been uncovered which a jury could reasonably weigh in assessing guilt or innocence.

   Despite his recognition of the necessity of proving prejudice, movant failed to plead supportive facts or the existence of admissible evidence. We do not imply approval or disapproval of movant's formulation as to prejudice, but certainly his failure to plead facts in his motion was not the result of ignorance.

3. Before the jury was impaneled defense counsel, demonstrating competence not acknowledged by movant, recited for the record that they had attempted but failed to serve subpoenas on Jack Reynolds and Tronky Theodoro. Donald O'Riley's response to service of the subpoena was to comment, "No way," and to run out the door. Counsel did not mention anyone named Ollie May Long.

■ Movant's final instance of ineffective assistance of counsel points to counsel's alleged failure to object to the State's use of the plea hearing transcript to impeach movant's brother (whom defendant had called as a witness) during cross-examination of the brother at the principal trial. Movant alleged that use of the transcript was subject to objection on the ground that the State had failed to comply with his request for its disclosure in pre-trial discovery. The transcript in question is that previously discussed in this opinion, where we determined that the State's failure to "provide" the transcript did not render movant's trial unfair, and thus it cannot be said that failure of defense counsel to object to that use constituted ineffective assistance of counsel. Furthermore, the trial record demonstrates that when the prosecutor attempted to read another portion of the guilty plea transcript, defense counsel successfully interposed an objection on grounds of materiality and relevance. We find this contention by movant conclusively refuted by the records of the case and it was properly denied. Rule 27.26(e).

### IV.

■ Movant's next contention is that the dual charges for which he was tried and convicted placed him twice in jeopardy for the same offense, because the assault was allegedly an essential element of the robbery. Movant did not raise this ground in his motion; counsel has raised it for the first time on appeal. Rule 27.26(j) ordinarily precludes our consideration of the matter. In the interests of judicial economy, however, we have reviewed the trial transcript and find that the circumstances of the crime fall foursquare within the holding of *State v. Neal,* 514 S.W.2d 544 (Mo. banc 1974). The contention fails.

### V.

■ Movant's final contention levels error at the trial court's having imposed consecutive sentences in the criminal proceeding without any indication of record that imposition of consecutive sentences resulted from his exercise of discretion rather than compliance with the mandate of § 546.480, since declared unconstitutional in *State v. Baker,* 524 S.W.2d 122 (Mo. banc 1975). Under our holding there, when consecutive sentences have been imposed upon a defendant prior to the declaration of the unconstitutionality of § 546.480, it must be presumed that the consecutive sentences were imposed in compliance with the unconstitutional mandate of that section, and should, accordingly, be set aside and the case remanded for the limited purpose of resentencing by the trial court. At that time, the trial judge should spread on the record his exercise of discretion in determining whether to impose concurrent or consecutive sentences. *Chambers v. State,* 554 S.W.2d 112, 115 (Mo.App.1977); *Gallup v. State,* 542 S.W.2d 616, 617 (Mo.App.1976). As the trial court did not make such a record, the hearing court erred is not setting aside the consecutively running sentences and movant is entitled to limited relief on appeal.

The judgment below denying movant's Rule 27.26 motion is affirmed on all grounds except the erroneous imposition of consecutively running sentences. The judgment is reversed and the cause remanded for the limited purpose of resentencing by the trial court in exercise of its discretion as to whether the sentences assessed by the jury should be ordered to run consecutively or concurrently.

MORGAN, C. J., BARDGETT, DONNELLY, SEILER and SIMEONE, JJ., and FINCH, Senior Judge, concur.

WELLIVER, J., not participating because not a member of the Court when cause was submitted.

### ORDER

DONNELLY, J., withdraws his concurrence and dissents in separate dissenting opinion filed.

DONNELLY, Judge, dissenting.

In 1921, the great Cardozo said: "The judge, even when he is free, is still not

wholly free. He is not to innovate at pleasure. He is not a knight-errant, roaming at will in pursuit of his own ideal of beauty or of goodness. He is to draw his inspiration from consecrated principles. He is not to yield to spasmodic sentiment, to vague and unregulated benevolence. He is to exercise a discretion informed by tradition, methodized by analogy, disciplined by system, and subordinated to 'the primordial necessity of order in the social life.' Wide enough in all conscience is the field of discretion that remains." Benjamin N. Cardozo, *The Nature of the Judicial Process* (New Haven: Yale University Press, 1921).

In 1954, the Supreme Court of the United States, no doubt impatient with representative democracy, outlawed racial segregation in the public schools of the states. *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). In my view, the opinion in *Brown* drew its "inspiration from consecrated principles." It has already secured its place in history by virtue of its declaration for decency and justice. Unfortunately, it also established a pattern for subsequent distortions of the judicial process.

In 1958, the Supreme Court of the United States, no doubt outraged by the conduct of the Legislature and Governor of Arkansas, declared that the "supreme Law of the Land," which binds all state officials, including judges (Article VI), is whatever a majority of the persons who are members of the Supreme Court at any particular time in history say it is. *Cooper v. Aaron*, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958).

In a long line of cases, beginning in 1961, the Court expanded the absorption doctrine to effectually impose upon the states, through the Due Process Clause of the Fourteenth Amendment, nearly all of the constraints of the Federal Bill of Rights.

But probably the most devastating blow to the historic concept of federalism was the evolution of the *compelling state interest* test.

In 1905, the United States Supreme Court, in *Lochner v. New York*, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937, struck down a state statute which provided that no employees should be required or permitted to work in bakeries more than sixty hours in a week, or ten hours a day, holding that such statute was an unreasonable, unnecessary and arbitrary interference with the right of an individual to contract. Mr. Justice Holmes had the following to say in dissent:

> "It is settled by various decisions of this court that state constitutions and state laws may regulate life in many ways which we as legislators might think as injudicious or if you like as tyrannical as this, and which equally with this interfere with the liberty to contract, * * *. Some of these laws embody convictions or prejudices which judges are likely to share. Some may not. But a constitution is not intended to embody a particular economic theory, whether of paternalism and the organic relation of the citizen to the State or *laissez faire*. It is made for people of fundamentally differing views, and the accident of our finding certain opinions natural and familiar or novel and even shocking ought not to conclude our judgment upon the question whether statutes embodying them conflict with the Constitution of the United States." 198 U.S. at 75 and 76, 25 S.Ct. at 546–547.

In a period of several years before and after the decision in the *Lochner* case, the United States Supreme Court, under the mantle of "substantive due process," rather routinely struck down state legislative enactments. This period has come to be known as the *Lochner Era*, and was referred to by Mr. Justice Black, in April, 1963, in the case of *Ferguson v. Skrupa*, 372 U.S. 726, 730, 83 S.Ct. 1028, 1031, 10 L.Ed.2d 93, as follows:

> "The doctrine that prevailed in *Lochner*, * * * and like cases—that due process authorizes courts to hold laws unconstitutional when they believe the legislature has acted unwisely—has long since been discarded. We have returned to the original constitutional proposition that courts do not substitute their social and economic beliefs for the judgment of legislative bodies, who are elected to pass laws."

Mr. Justice Black was not omniscient in this particular instance. On June 17, 1963, in *Sherbert v. Verner*, 374 U.S. 398, 406, 83 S.Ct. 1790, 10 L.Ed.2d 965, the Court considered "whether some compelling state interest" justified a state statutory infringement of a right under the First Amendment and declared the statute, as applied, unconstitutional.

In April, 1969, in *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600, the Court struck down state statutes requiring one year's residence prior to receiving welfare benefits, holding that because this requirement impinged on the constitutionally guaranteed right of interstate travel, it was to be judged by the standard of whether it promoted a compelling state interest.

In January, 1973, in *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147, the Court struck down a Texas abortion statute, holding that the statute infringed on a pregnant woman's right of privacy, in the opinion of the Court could not be justified by a compelling state interest, and, therefore, violated the Due Process Clause.

*Roe v. Wade* graphically illustrates the point I wish to make:

(A) The Court first found that a pregnant's woman's right of privacy is a "fundamental" right under the Due Process Clause of the Fourteenth Amendment.

(B) The Court recognized that this right of privacy is not absolute but "that some state regulation in areas protected by that right is appropriate." 410 U.S. at 154, 93 S.Ct. at 727.

(C) The Court recognized that at some point in pregnancy, a state's "interests in safeguarding health, in maintaining medical standards, and in protecting potential life * * * become sufficiently compelling to sustain regulation of the factors that govern the abortion decision." 410 U.S. at 154, 93 S.Ct. at 727.

(D) The Court then proceeded to declare, by trimesters of pregnancy, the interests of a state which it considers "compelling."

The ultimate distortion of the judicial process, at least in my area of concern, occurred in 1978. To borrow from Raoul

Berger: "Unhappily * * * bad cases in course of time crowded out the good, being congenial to the deep-seated greed for power from which judges, alas, are not immune. And by dint of repetition, what was manifest usurpation became clothed in respectability." Berger, *"Law of the Land" Reconsidered*, 74 Northwestern University Law Review 1, 30 (1979). On June 28, 1978, a judge of the United States District Court for the Western District of Missouri substituted his will for the judgment of the people of Missouri, and declared unconstitutional the residency requirement for office which appears in Article IV, § 13 of the Missouri Constitution. *Antonio v. Kirkpatrick*, 453 F.Supp. 1161 (1978). On appeal, the United States Court of Appeals for the Eighth Circuit affirmed, being "satisfied that the District Court's findings of fact are not clearly erroneous and that it applied correct principles of law." *Antonio v. Kirkpatrick*, 579 F.2d 1147, 1150 (1978).

What then is to be the fate of state legislative enactments? I think it must be conceded, *on the record*, that some time ago we entered another *Lochner Era*. It has been the law for several years that when a judge is asked to determine the constitutional validity of a state statute, he must first determine whether the right allegedly impinged upon is a "fundamental" right and, if so, whether such impingement can be justified by a compelling state interest.

This brought us to the question: What are state court judges to do in this situation?

The problem posed was that the *compelling state interest* standard requires a judicial evaluation which is subjective in nature and which requires that a judge decide whether "the legislature has acted unwisely." As noted by Mr. Justice Rehnquist in *Roe v. Wade*, "the compelling state interest standard will inevitably require (courts) to examine * * * legislative policies and pass on the wisdom of these policies in the very process of deciding whether a particular state interest put forward may or may not be 'compelling'." 410 U.S. at 174, 93 S.Ct. at 737.

State court judges in Missouri are bound to support the Constitution of the United States *and* the Constitution of the State of Missouri. Article VI of the United States Constitution provides that the judges in every state shall be bound by the "supreme Law of the Land." Therefore, when the United States Supreme Court has considered and pronounced upon the constitutional validity of a particular Missouri statute, we are bound to follow that pronouncement and no problem arises. A problem does arise, however, when there has been no such pronouncement, because, in that situation, state court judges in Missouri are expressly admonished by our *state* Constitution not to "exercise any power properly belonging" to the legislative department (Mo.Const. Art. II, § 1)—we are expressly forbidden by our *state* Constitution from determining whether "the legislature has acted unwisely."

In this situation, were state judges in Missouri being directed by the United States Supreme Court to apply a standard which required, in the application, that we "legislate" and, in so doing, violate the Constitution of Missouri? We could not assume that the Justices of the Supreme Court of the United States were unaware of our dilemma. Therefore, the question unavoidably arose: Does the Court intend that state court judges shall any longer play a significant role in shaping the law under the Constitution of the United States?

The answer to the question came on April 24, 1979, and the answer is "no." In *North Carolina v. Butler*, —— U.S. ——, 99 S.Ct. 1755, 1759, 60 L.Ed.2d 286, the Court disagreed with North Carolina's treatment of the *Miranda* rule, and declared that "a state court can neither add to nor subtract from the mandates of the United States Constitution." It is significant here to note that the *Miranda* rule does not appear in the United States Constitution. It was enacted by the Court in 1966 and is a "mandate" of the Court. Of course, *another* method is available (*See* Article V) for amending the Constitution.

In any event, the role of state courts has now been defined. We must confine ourselves to *application* of the "mandates" of the Court. Therefore, I would immediately withdraw into our designated sphere as gracefully as possible. Where situations or issues require it, we must cheerfully and faithfully follow the "mandates" of the Court. However, it is no longer necessary or proper for us to *reach out* to interject Missouri state courts into adjudication of questions involving the United States Constitution as written.

For a beginning, I would enter an order, effective immediately as to all motions to vacate pending in our trial courts or on appeal, excising the words "or the United States" from the first paragraph of Rule 27.26, and directing that all movants be given the opportunity to amend motions or to file new motions addressing their rights under the Missouri Constitution.

In *Butler*, supra, the Court made a point of noting that it "must accept whatever construction of a state constitution is placed upon it by the highest court of the State." I suggest that we begin now to meaningfully implement the provisions of the Missouri Bill of Rights.

I have mixed emotions about all of this but must admit to a feeling of some relief. Attempting to predict during the past several years what the "supreme Law of the Land" will be in a given situation has sometimes proved to be an exercise in futility. *See Rodgers v. Danforth*, 486 S.W.2d 258 (Mo. banc 1972).

I would reverse and remand to the trial court with directions to permit movant to amend.

I respectfully dissent.