**STATE of Missouri,
Plaintiff-Respondent,**

v.

**Harold JOHNSON, Defendant-Appellant.**

**No. 38905.**

Missouri Court of Appeals,
St. Louis District,
Division Four.

May 9, 1978.

Doris Black, St. Louis, for defendant-appellant.

John D. Ashcroft, Atty. Gen., Paul Robert Otto, Stanley Robinson, Asst. Attys. Gen., Jefferson City, Courtney Goodman, Jr., Pros. Atty., Lawrence E. Mooney, George Meyer, Asst. Pros. Attys., Clayton, for plaintiff-respondent.

DOWD, Presiding Judge.

Defendant was convicted by a jury of carrying a concealed weapon, RSMo § 564.-610, and sentenced under the Second Offender Act (§ 556.280) to five years in the custody of the Missouri Department of Corrections. We affirm.

Officer Louis Dauten was the primary witness for the state. He testified that he left the Dellwood Police Station to make his rounds on July 22, 1976 at 3:30 p.m. The station is located at 1415 Chambers Road. Next to the police station, separated from it by Atwater Drive, is a gas station on Chambers Road. As Officer Dauten proceeded on Atwater Drive and turned onto Chambers Road he glanced at the gas station and noticed defendant there in the parking lot. He recognized defendant and his automobile, a 1975 white over orange Oldsmobile Toronado because he had seen both the

defendant and his auto nine months earlier when investigating an automobile accident that defendant was involved in. At the time of the accident, defendant's auto bore Missouri license plates. The officer noticed that the auto now had Illinois plates. In addition, the officer was familiar with defendant because defendant had been discussed at police criminal information exchange meetings. At these meetings, Officer Dauten learned defendant was involved in area drug activities, that he always had a weapon with him, and that he had numerous arrests and convictions for weapons charges and assaults. For these reasons, the officer turned around and parked across from the gas station and observed the defendant. He observed that there was a passenger in the auto with defendant. After watching 3–4 minutes, Officer Dauten drove across the street to the gas station and pulled directly behind defendant. Defendant immediately pulled his auto off the lot and drove east on Chambers Road. Officer Dauten tried to pull out behind him. Since there were autos coming, he turned on his red light to get out in the traffic, but then turned them off. He followed defendant two short blocks and caught up with him at a red light at the intersection of Chambers and West Florissant. He noticed defendant looked at him through his rear view mirror and the passenger turned around to observe him more than once. When the vehicle left this intersection, Office Dauten again turned on his overhead red lights. The passenger again turned around and the vehicle kept going, but was not speeding. After 4 blocks, it finally stopped. As it stopped, the officer observed the men moving around inside the auto. He radioed for a backup unit as he stopped his vehicle. When both cars were stopped, defendant got out of his auto and walked back to the officer's auto. The officer also got out and requested defendant's driver's license. Defendant gave him a traffic ticket, an adequate substitute on which to drive. The officer studied the ticket and then told defendant to go back and be seated in defendant's auto. The officer went to the passenger side of defendant's auto and asked the passenger for identification. He stated he had none. Officer Dauten asked him to step out of the car and walked him back to the passenger door of the police vehicle. At this time the assist car drove up. The passenger gave his name as Steven Wright. Officer Dauten radioed the two names and birthdates and the auto license number to check if there were warrants outstanding on the men, and whether the Illinois plate was a violation. When the officer left Mr. Wright with the assist officer, and walked back towards the driver's door of defendant's auto. He asked defendant to step out of the auto. Defendant replied, "what for, what did I do?" Officer Dauten reached over and grasped the door handle and started to open the door. Defendant held the door closed from the inside. The door opened slightly and then opened completely when the officer pulled harder. Defendant's body leaned to the left and the officer observed in the front seat a blue towel (also referred to as a blue bathrobe) which slipped away and exposed what appeared to be the receiver of a shotgun. Defendant's right hand was on or underneath the towel around the receiver of the shotgun on the trigger area. The officer drew his revolver for his own protection. The defendant let go of the shotgun and put his hands up. The officer ordered him out of the auto. As defendant emerged from the auto, the towel fell completely away and the officer could readily observe the shotgun, which was a 20-gauge shotgun about 3½ feet long. The defendant was placed against the car, patted down for other weapons, and handcuffed. The officer searched the entire auto and found two more shotgun shells in a compartment in the driver's door. Upon examination of the gun he found a live shell in the chamber and 2 more in the magazine. The weapon was later found to be functioning properly when fired at City Hall using one of the shells. After the arrest was made, information came back on the officer's radio that defendant had an extensive felony record and was considered dangerous.

The only other two witnesses for the state were the gas station attendants, one who filled defendant's gasoline tank and another who washed his windows. Both testified that they did not see a gun in the auto when they were servicing it.

The defense's two witnesses were Steven Wright and Carolyn Hinton. Steven Wright testified that the gun was in the back seat of the automobile, in plain view, uncovered by a towel. He explained that Carolyn Hinton had left it there because it needed repair. He and defendant had dropped her off at a grocery store, went to get gas, and were planning on picking her up at the grocery store. They then planned to take her to the gun repair shop which is on Chambers Road near the gas station. Steven Wright remembered seeing the officer watching them at the gas station, but said the officer then drove away. He next saw the officer behind them at the intersection, but contradicted the officer's testimony by stating that defendant stopped the auto immediately after the officer turned on his red lights. He also claimed that the gun seized by the officer was in the back seat, not front seat next to defendant.

Carolyn Hinton testified that the gun had been given to her by her brother because her house had been broken into. It had become jammed and she had put it in the back seat when she got in defendant's auto in order to take it to the repair shop. She last saw the gun when she was dropped off at the grocery store. At that time it was in the back seat, uncovered. She stated she had two shells with her in her purse, and left them on the seat of the auto when she went to the grocery store.

█ Defendant's first point is that the trial court erred in overruling his motion to suppress evidence because there was no probable cause to stop his automobile. However, a police officer may in appropriate circumstances, stop a person for investigating possible criminal behavior even though there is no probable cause to make an arrest. *Terry v. Ohio,* 392 U.S. 1, 22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889, 906 (1968). "A brief stop of suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." *Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972). Therefore, where officers entertain a reasonable suspicion that criminal activity may be afoot they may stop the suspected person, identify themselves, require the suspect to identify himself, and make reasonable inquiries concerning his activities. *State v. Rankin,* 477 S.W.2d 72, 75[3] (Mo.1972).[1]

█ The facts here entitled the officer to entertain a reasonable suspicion as to defendant's activities and to briefly detain him. These facts include the officer's familiarity with defendant based on what he had learned at police criminal information meetings, that is, that defendant was involved in drug activities and always carried a weapon, and had numerous arrests and prior felony convictions. Another fact is that defendant's auto bore an out of state license plate when 9 months earlier it carried a Missouri plate. These further facts are also significant: that defendant pulled his car off the gas station lot as soon as the officer pulled in behind him; that the defendant watched the officer in his mirror as the officer followed him; that the passenger turned around at least twice to observe the officer; and, that defendant's auto continued 4 blocks after the officer turned on his red lights, while both the defendant and his passenger furtively moved around inside the auto. All these facts entitled the officer to briefly detain the defendant and ask for identification, since "the interference with individual liberty that results when an officer stops an

---

1. The Supreme Court has defined "reasonable suspicion" entitling an officer to stop an individual as a situation where an officer is aware of "specific articulable facts, together with rational inferences from those facts", that reasonably lead him to believe criminal activity may be occurring. *United States v. Brignoni-Ponce,* 422 U.S. 873, 884, 95 S.Ct. 2574, 2582, 45 L.Ed.2d 607 (1975).

automobile and questions its occupants . . . is modest" when balanced against the legitimate needs of law enforcement. *United States v. Brignoni-Ponce,* 422 U.S. at 879–880, 95 S.Ct. at 2579.

Thus the initial stop of defendant's vehicle was proper based on the officer's reasonable suspicion of criminal activity. The subsequent discovery of the shotgun and towel were not the result of a search, but under the "plain view" doctrine. *State v. Rankin,* supra, 477 S.W.2d at 75[4]. Thus these items were properly admitted into evidence. The point is dismissed.

The next point defendant raises is that the trial court committed prejudicial error in admitting State's Exhibits 1 and 2, the shotgun and blue bathrobe, into evidence after the conclusion of the defendant's presentation of evidence. Defendant moved to exclude the exhibits for lack of proper introduction. The court overruled the motion and allowed the State to "untimely formally offer" the exhibits into evidence.

The trial court has broad discretion as to order of proof and the reopening of a case. *Kansas City v. Ramsey,* 525 S.W.2d 392[2] (Mo.App.1975). Since defense counsel was not taken by surprise by the introduction of the exhibits, *State v. Walker,* 531 S.W.2d 55, 58 (Mo.App.1975) and since the exhibits had in fact been exhibited to the jury, and witnesses were examined and cross-examined concerning them, they were actually in evidence although not formally introduced prior to the close of the State's case. *State v. Robinson,* 325 S.W.2d 465[7] (Mo.1959); *State v. Payne,* 452 S.W.2d 805[10] (Mo.1970). We find no abuse of discretion. The point is without merit.

Defendant next claims the court erred in failing to direct a judgment of acquittal at the close of the State's case and at the close of all the evidence, because there was a dispute as to whether the gun was concealed. The officer testified that it was covered by a blue towel, while the defense witnesses testified it was in plain view in the back seat. When considering a challenge to the sufficiency of the evidence, we accept as true all evidence which tends to prove defendant's guilt. *State v. Potter,* 530 S.W.2d 268[2] (Mo.App.1975). The jury weighs the evidence, not the appellate court. *State v. Achter,* 514 S.W.2d 825[2] (Mo.App.1974). We find there was sufficient substantial evidence to support the verdict. *State v. Achter,* supra.

Defendant next claims the court erred in not declaring a mistrial when the state made a reference to defendant's failure to testify in its closing argument. The defendant points to the following portion of the argument as direct references to defendant's failure to testify: "In light of all the evidence in this case, why did Harold Count Johnson come back and meet Patrolman Dauten, why did he not wait for Patrolman Dauten to get up to that car? I think the answer is pretty clear." The defendant's position is that since defendant was the only person who could have answered the questions posed, the effect was to "leave in the jurors minds a suggestion that the defendant did not take the stand because if he did so he would only incriminate himself further."

The cases are clear that only direct and certain, (*State v. Rothaus,* 530 S.W.2d 235[1] (Mo. banc 1975)), non ambiguous and unequivocal, (*State v. Frankoviglia,* 514 S.W.2d 536[5] (Mo.1974)) references to the accused's failure to testify are violative of his constitutional and statutory privilege against self-incrimination. The challenged statements do not directly and certainly refer to defendant's failure to take the stand. In fact the statements made by the prosecutor here do not even indirectly refer to the failure of the defendant to testify but rather refer to the actions of the defendant at the time his auto was stopped by the police. The point is *without merit.*

Defendant claims he was denied a fair trial because his trial was before an all white jury and because of pretrial publicity. Only if a defendant is deprived *by design* of having blacks on the jury are his constitutional rights invaded. *State v.*

*Brownridge,* 459 S.W.2d 317, 318 (Mo.1970). Here there is no record of how the jury was selected. No motion to quash the venire was filed, no objection to the impartiality of the jury was made, and no evidence of systematic exclusion of blacks from the jury was introduced. The point is without merit.

Defendant's final contention is that pre-trial publicity prejudiced defendant's right to a fair trial. The defendant's brief informs us that he had been tried in May and September of 1975 for stealing over $50 but both these trials had resulted in mistrials. The trial of this case occurred in December, 1976, over one year later. The defendant further notes that his name had been carried in numerous local papers several months before the jury was impaneled as a suspect in an "infamous" murder case, although he was not formally charged. The defendant states, "while no jurors indicated knowledge of the defendant's involvement in these matters it seems apparent that the jurors associated the defendant with these crimes. . . ."

Whether jurors have been influenced by newspaper accounts so as to deprive defendant of an impartial jury depends upon whether they are able to recall any details of the published article or appear to clearly recall the article and have formed any opinion as to guilt or innocence of the defendant. *State v. Keeny,* 431 S.W.2d at 97[5]. Defendant's bare statement that "it seems apparent that the jurors associated the defendant with these crimes. . . .", without further evidence of the jury's bias, is totally insufficient to find that the defendant was unfairly tried. The point is without merit.

The judgment is affirmed.

SNYDER, J., and ALDEN A. STOCKARD, Special Judge, concur.