**STATE of Missouri, Respondent,**

v.

**Earl Lee PRESTON, Appellant.**

No. 10889.

Missouri Court of Appeals,
Southern District,
Division One.

June 11, 1979.

Betty A. Pace, Springfield, for appellant.

John D. Ashcroft, Atty. Gen., Eric Martin, Asst. Atty. Gen., Jefferson City, for respondent.

FLANIGAN, Chief Judge.

A jury found defendant Earl Lee Preston guilty of the offense of sodomy (§ 563.230)[1] and recommended a sentence of 25 years' imprisonment which the trial court imposed. Defendant appeals.

1. Unless otherwise indicated all references to rules are to Missouri Rules of Court, V.A.M.R., and all references to statutes are to RSMo 1969, V.A.M.S.

The first of defendant's six "points relied on," none of which is valid, is that the trial court erred in receiving into evidence, over defendant's objection, a jacket and a pair of tennis shoes. The objection was presented initially in a pretrial motion to suppress (§ 542.296—Laws 1974, § 8, p. 922) on which a hearing was held. The objection, renewed at the trial, was based, in essence, on the ground that the jacket and shoes were seized by police officers in violation of defendant's rights under § 15 of Art. I of the Constitution of Missouri, and the Fourth and Fourteenth Amendments to the Constitution of the United States.

The circumstances leading up to the seizure by the officers of the jacket and shoes involve two offenses, the felonious stealing of a purse and its contents on June 24, 1977, and the sodomy which was committed on July 27, 1977. The victim of the stealing was Johnna Wheeler. The victim of the sodomy was a ten-year-old boy named Wesley. Both offenses were committed in Springfield, Missouri.

Detective Ted Hobson of the Springfield police department was assigned to the investigation of the stealing case. Detectives Dan Wilson and Tony Glenn, under the supervision of Sgt. Ayers, were assigned to the investigation of the sodomy.

On June 24, 1977, detective Hobson interviewed Johnna Wheeler who was a church secretary. Johnna told Hobson that she always kept her purse under the desk in the lobby of the church; that a black man named Earl Lee Preston had come to the church several times begging for money; that Preston was in the church on the day the purse was stolen. The purse was taken sometime during a period of two or three minutes while Johnna was away from the lobby. Preston was in the lobby when Johnna left it but was not there when she returned. The contents of the purse were of such value that the unlawful taking was a felony. Johnna described Preston as being a black man, about 20 years old, "short hair, kind of fuzzy beard, weighed about 200 pounds, about 5'9" or 5'10", very stocky and muscular."

Hobson obtained information to the effect that Preston had been living "at the Missouri Motel and also at the Seville Hotel" but efforts by Hobson to find him there had been unsuccessful.

On July 28, 1977, the day following the sodomy offense, detectives Glenn and Wilson interviewed Wesley, the victim. Wesley described his assailant as being a black man, 5'8" or 5'9", muscular build, short hair, and weighing approximately 150 pounds. Wesley told the officers that his assailant wore a dark leather jacket and a pair of brown tennis shoes with ribbed soles. Another boy, Lance, had told Glenn and Wilson that he had seen a black man in the wooded area where the sodomy took place on the day before that offense was committed. The black man had told Lance that his name was "either Lee or Leroy." Lance described the man as being a male Negro, 5'10" or 5'11", very large build, very muscular, short hair with facial hair and very dark complexion.

On July 29, 1977, detective Hobson overheard a conversation among officers Glenn and Wilson and Sgt. Ayers concerning the sodomy case, including their description of the sodomy suspect. Hobson informed the other officers that the description fit that of Earl Preston whom Hobson was seeking on a "grand theft charge."

A telephone call to the Seville Hotel elicited information from the clerk to the effect that Preston was registered there and that his room number was 322. Officers Hobson, Glenn and Wilson made one trip to the hotel but Preston was not there at that time.

Later the same day, July 29, officers Glenn and Wilson returned to the Seville Hotel. They did not have a search warrant or an arrest warrant. They knocked on the door and a black man opened it. He was in his 20's, approximately 5'10" or 5'11", and had a "large build." He told the officers his name was Earl Lee Preston. The officers identified themselves as members of the Springfield police department and asked permission to enter the room. After Preston granted the request the officers

informed him that they were placing him under arrest for grand stealing.

While this conversation was taking place the officers "had occasion to observe the contents of room 322" which was a small room. The closet door was standing open and on it was hanging the dark blue jacket in plain view. Sitting under the edge of the bed, also in plain view, was a pair of brown tennis shoes which had ribbed soles. The officers then informed Preston that they wanted to talk with him with regard to a sexual assault which had occurred in Springfield and they told him they were looking for a weapon which had been used in connection with that assault. Glenn testified that he asked Preston "if we could have his permission to search the room" and that Preston "told us we could search it." No weapon was found in the search of the room but the officers took possession of the jacket and shoes. Although the officers were armed they did not draw their weapons but the record is silent on whether the weapons were visible. The officers took Preston and the jacket and shoes to the police station. Before Preston consented to the search, officer Glenn informed him that he had a right to refuse to allow the search.

Defendant does not challenge the legality of his arrest. His argument is that the warrantless seizure of the jacket and shoes was invalid because the requirements of *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969) were not met.

*Chimel* imposed limitations upon the scope of a warrantless search justified as being incident to a valid arrest. The Supreme Court of the United States held that a search incident to a valid arrest may extend to the area within the immediate control of the arrestee, that is the area from within which he may gain possession of a weapon or destructible evidence.

In *State v. Epperson,* 571 S.W.2d 260, 263 (Mo. banc 1978) these principles were stated: In general, an entry and search without a warrant are deemed unreasonable under the Fourth Amendment to the Constitution of the United States unless the action falls within certain carefully delineated exceptions; the burden is on the state to show an exception exists; among the exceptions are seizures of evidence in plain view.

This court holds that the seizure was justified under the plain view exception. It is therefore unnecessary to determine whether it is justifiable under other exceptions mentioned in *Epperson,* including "searches incident to a valid arrest" and "searches with consent."

■ The plain view exception, or doctrine, received lengthy discussion in *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). The Supreme Court of Missouri, summarizing its requirements, has said:

"[*Coolidge*] is authority for the proposition that plain view alone is not enough to justify a warrantless seizure. It is necessary that (1) the evidence be observed in plain view while the officer is in a place where he has a right to be, (2) the discovery of the evidence be inadvertent and (3) it is apparent to the police that they have evidence before them." *State v. Collett,* 542 S.W.2d 783, 786 (Mo. banc 1976).[2]

■ Requirement (1) is met in the case at bar because both the jacket and the shoes were in the plain view of officers Glenn and Wilson and the presence of the two of them in defendant's hotel room was with the permission of the defendant himself [3]—thus the officers had a right to be there.

■ Equally clear is the fact that requirement (3) is met. Upon seeing the

---

**2.** *Collett,* supra, also holds "that defendant's motel room was to be accorded fourth amendment protection against unreasonable search and seizure. *Stoner v. California,* 376 U.S. 483, 11 L.Ed.2d 856, 84 S.Ct. 889 (1964)."

**3.** "An officer is generally held to be lawfully present when he is in any of the following locations or situations: (i) the officer is in the

premises with the consent of the defendant." (Authorities cited.) Underhill, Criminal Evidence, Fifth Edition, Vol. II, § 417, note 54. See also *United States v. Griffin,* 530 F.2d 739, 743 (1976); *United States v. Leal,* 460 F.2d 385, 389 (1972); *Alberti v. State,* 495 S.W.2d 236, 237[1–3] (Tex.Cr.App.1973).

jacket and the shoes, in light of the information previously given them by Wesley, the officers knew that they had "evidence before them." The fact that the evidence pertained to an offense other than the one for which defendant had been arrested is of no moment. *United States v. Simpson,* 453 F.2d 1028, 1031[7–8] (1972); *Ramirez v. Rodriguez,* 467 F.2d 822, 824 (1972).

Requirement (2) is met if it may properly be said that the discovery of the jacket and shoes was "inadvertent." In *Coolidge,* supra, the supreme court did not define the term "inadvertence."[4] That omission is discussed at length and sought to be clarified in *United States v. Hare,* 589 F.2d 1291 (1979). There the United States Court of Appeals for the Sixth Circuit rejected the contention that the supreme court was using the word "inadvertent" as a synonym for "unexpected" or "unanticipated." Instead, said the court of appeals, the supreme court was using the word "inadvertent" as a synonym for "unintentional."

"We conclude, then, that 'inadvertence' in this context means that the police must be without probable cause to believe evidence would be discovered until they actually observe it in the course of an otherwise-justified search. There are many times when a police officer may 'expect' to find evidence in a particular place, and that expectation may range from a weak hunch to a strong suspicion. However, the Fourth Amendment prohibits either a warrant to issue or a search based on such an expectation. Yet if in the course of an intrusion wholly authorized by another legitimate purpose, that hunch or suspicion is confirmed by an actual observation, the police are in precisely the same position as if they were taken wholly by surprise by the discovery. The same exigent circumstances exist, and no warrant could have been obtained before the discovery." *United States v. Hare,* 589 F.2d 1291, 1294 (1979).

■ Before their entry into room 322 the officers did not know of the specific location of the jacket and shoes in room 322 nor did they know that either item was present in the room at all. Any expectation they may have had amounted only to a "weak hunch" or certainly no more than a "strong suspicion." Under *Hare,* the discovery of the items was "inadvertent." Other authorities supporting this determination are cited below.[5]

Defendant's first point has no merit.[6]

"The 'plain view' exception to the warrant requirement is not in conflict with the law of search incident to a valid arrest expressed in *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685. The Court there held that '[t]here is ample justification * * * for a search of the arrestee's person and the area "within his immediate control"—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.' Id., at 763, 89 S.Ct. at 2040. The 'plain view' doctrine would normally justify as well the seizure of other evidence that came to light during such an appropriately limited search. The court in *Chimel* went on to hold that '[t]here is no comparable justification, however, for routinely searching any room other than that in which an arrest occurs—or, for that matter, for searching through all the desk drawers or other closed or concealed areas in that room itself. Such searches, in the absence of well-recognized exceptions, may be made only under the authority of a search warrant.' Ibid. *Where, however, the arresting officer inadvertently comes within plain view of a piece of evidence, not concealed, although outside of the area under the immediate control of the*

4. The Supreme Court of Idaho has pointed out that the portion of the opinion of Mr. Justice Stewart in *Coolidge* which contains "the inadvertence requirement" was signed by only four justices. "Since the inadvertent requirement was not espoused by a majority of the Court, it is not binding upon this Court as precedent." *State v. Pontier,* 95 Idaho 707, 518 P.2d 969 (1974).

5. "The discovery of the passport, although a foreseeable possibility, was unplanned and inadvertent. What *Coolidge* proscribes is an anticipated discovery, where the police know in advance the location of the evidence and intend to seize it." *United States v. Bolts,* 558 F.2d 316, 320 (1977); See also *United States v. Worthington,* 544 F.2d 1275, 1280 (1977) and *United States v. Cushnie,* 488 F.2d 81, 82 (1973).

 The supreme court itself in *Coolidge* said: "[W]e deal here with a *planned* warrantless seizure. This Court has never permitted the legitimation of a planned warrantless seizure on plain-view grounds." 91 S.Ct. at 2041.

6. The *Coolidge* opinion itself contains language supporting this holding:

Defendant's second point is that the trial court erred in receiving evidence, over defendant's objection, with respect to extrajudicial identifications of defendant based on defendant's presence in a police lineup. The sole basis for the objection is that defendant was not represented by counsel at the time of the lineup nor had he waived his "right" to counsel at that stage.

The lineup was held on July 30, 1977, at approximately 10:00 a. m. The transcript shows that a "Complaint in Felony case" (see Rule 21.08) was filed in the magistrate court on July 30, 1977, but it does not show whether that filing occurred before or after the lineup was held on the same day. Under Missouri cases cited infra, that sequence, even if ascertained, is of no moment. On some day thereafter, and prior to August 19, 1977, the preliminary hearing was held in magistrate court. The information on which this prosecution was based was filed in the circuit court on August 22, 1977.

▉ Defendant's second point is without merit. Defendant did not have a constitutional right to counsel at the time of the lineup for the reason that it was held prior to "the initiation of adversary judicial criminal proceedings" as that term is used in *Kirby v. Illinois,* 406 U.S. 682, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972). Defendant relies upon *Arnold v. State,* 484 S.W.2d 248 (Mo.1972) where the lineup was held *after* the filing of the complaint and prior to the filing of an information. However, the holding in *Arnold* was reversed in *Morris v. State,* 532 S.W.2d 455 (Mo. banc 1976) and our supreme court approved other Missouri cases, there cited, to the effect that the "per se exclusionary rule of *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 and *Gilbert v. California,* 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 has no application" to a lineup conducted prior to the filing of the information.

Other authorities hold that defendant had no constitutional right to counsel at the

stage when the instant lineup was held. *State v. Nylon,* 563 S.W.2d 540, 544[20] (Mo. App.1978); *State v. Hawkins,* 544 S.W.2d 880, 883[1] (Mo.App.1976); *State v. Johnson,* 539 S.W.2d 493, 518[6] (Mo.App.1976). See also *State v. Perkins,* 559 S.W.2d 52, 54 (Mo.App.1977); *State v. Wendell,* 547 S.W.2d 807, 809 (Mo.App.1977); *Caver v. State of Ala.,* 577 F.2d 1188, 1195[5] (1978); *Boothe v. Wyrick,* 452 F.Supp. 1304, 1314 (W.D.Mo.1978).

Defendant's third point is that the trial court erred "in failing to strike the jury panel and the jury as sworn because neither had any black members in violation of defendant's right to an impartial jury of his peers."

After the jury panel was sworn and the voir dire examination had been conducted, defense counsel stated: "Your Honor, I would move to quash this jury panel as it's presently constituted because it does not represent a fair cross-section of the community. Specifically there are no black members on the panel." A colloquy ensued between the court, the prosecutor, and defense counsel. The prosecutor stated that approximately 3 percent of Greene County's population is black and that the prospective jurors were selected at random; that recent cases had jury panels and juries which contained blacks among their members. The trial court stated that "within the last three or four months we have had a number of black jurors." Defense counsel did not voice disagreement with the comments made by the prosecutor or the court. More significant, and fatal to defendant's third point, is the fact that his counsel offered no evidence in support of the motion.

▉ Defendant, who is black, did not have an absolute right to have blacks on the jury or on the jury panel. "Only if a defendant is deprived *by design* of having blacks on the jury are his constitutional rights invaded. *State v. Brownridge,* 459 S.W.2d 317, 318 (Mo.1970)." *State v. John-*

---

*arrestee, the officer may seize it, so long as the plain view was obtained in the course of an appropriately limited search of the arrestee."*

(Emphasis added.) *Coolidge,* supra, 91 S.Ct. at 2038, fn. 24.

son, 566 S.W.2d 510, 514[11] (Mo.App.1978). See also State v. Pittman, 569 S.W.2d 277, 280[4] (Mo.App.1978); State v. Crockett, 543 S.W.2d 314, 321[11] (Mo.App.1976). The burden of showing systematic exclusion is on defendant[7] and it does not shift to the state until defendant makes a prima facie case of illegal exclusion. State v. Mooring, 445 S.W.2d 303, 304[1] (Mo.1969); Crockett, supra, at 321. Defendant's third point has no merit.

Defendant's fourth point deals with the testimony of state's witness Richard Fernandez, M.D. Defendant claims the trial court committed error in allowing Dr. Fernandez to testify because he was not shown to be properly qualified and because "his testimony concerning anal penetration was evidence of another separate crime with which defendant was not charged."

■ The information charged defendant with oral sodomy. Dr. Fernandez conducted a physical examination of the victim soon after the occurrence. The victim himself testified earlier that as a part of the transaction in which that offense was committed the defendant also committed anal sodomy. Defendant made no objection to the victim's testimony concerning the anal sodomy and it is clear that such an objection would have been without merit. State v. Parton, 487 S.W.2d 523, 527 (Mo.1972). In Parton the trial court properly permitted evidence concerning the commission of fellatio and sodomy as a part of the transaction which included the commission of the statutory rape, the latter being the offense on trial. To similar effect see State v. Mazzeri, 578 S.W.2d 355, 357[5, 6] (Mo.App. 1979). The testimony of Dr. Fernandez was similarly immune from the objection posed.

■ Also without merit is the contention that Dr. Fernandez lacked proper qualifications. The witness, a medical doctor, during his affiliation with St. Louis Medical Hospital treated 100 to 150 cases involving sexual assaults. About 25 of these dealt with the rectal area and of these cases 10 or 12 involved the attempted insertion of the penis into the rectum. Defendant's brief states that this background "is not a sufficient basis on which to base a medical opinion as to what caused the tear in the rectal area." The brief fails to state why the background is insufficient nor does it state what the writer claims was necessary to attain expertise in the field under consideration.

The qualification of an expert witness in a criminal trial is a matter resting primarily in the discretion of the trial court. State v. Williams, 515 S.W.2d 463, 466[3] (Mo.1974). No abuse of discretion has been shown. Defendant's fourth point has no merit.

Defendant's fifth point is that the trial court erred in "calling to the attention of the prosecutor that an element of the offense charged, to-wit, actual penetration of the victim's mouth, had not been established."

During the prosecutor's direct examination of the 10-year-old victim, the following testimony took place:

"Q. (by prosecutor) All right. What, if anything, next occurred?

A. He had his pants unzipped and had me put my mouth on his penis.

Q. And did you do that?

A. Yes.

Q. And was it inserted into your mouth?

A. Yes.

DEFENSE COUNSEL: Objection, Your Honor, that's leading.

THE COURT: Sustained.

Q. (by prosecutor) For what period of time did this continue?

"Numerous decisions of the Supreme Court have held or recognized that the burden of proving discrimination against members of a particular group or class in the selection of a grand or petit jury is on the party who asserts such discrimination."

---

7. See Anno. 33 L.Ed.2d 783—"Group or Class Discrimination in Selection of Grand or Petit Jury as Prohibited by Federal Constitution—Supreme Court Cases."
At p. 805 of that annotation, supported by many authorities there cited, is the following statement:

A. For about one minute."

A few minutes later, outside the hearing of the jury, the following occurred:

"THE COURT: The question as to which I sustained the objection was whether the black put his penis in the mouth. That question and the answer was stricken.

Then you asked him further what was done as between the mouth and the penis. And his answer was, 'He had me put my mouth over his penis.'

Frankly, I don't know what that means. It could mean about it or it could be around it or was that in the mouth. It could mean any number of things.

PROSECUTOR: Yes.

DEFENSE COUNSEL: Right. Your Honor, I think this would have been in the province of the state to point out. I think you have committed error here in bringing this up. I move for a mistrial at this time."

"A trial court may in its discretion interrogate witnesses, including the accused when he takes the stand. . . . In this case the questions by the court asked of appellant did no more than tend to explain or add to the understanding of the testimony already given. Such questions by the court are proper where the purpose is to develop more fully the truth and to clarify testimony already given." *State v. Cain,* 485 S.W.2d 60, 62 (Mo.1972). See also *State v. Tate,* 468 S.W.2d 646, 648[2] (Mo.1971).

 Under the foregoing authorities it would have been proper for the trial court to have clarified the testimony of the witness by questioning the witness himself. Here the court's comment was outside the hearing of the jury and in the presence of counsel for both sides. The propriety of the court's conduct is even less subject to question. Defendant's fifth point has no merit.

Defendant's sixth point is that the trial court erred "by failing to poll the members of the jury on the morning of the second day of the trial (September 23) as to whether any of said jury members had acquired knowledge concerning an attempted jail break on the evening of September 22 and the early morning of September 23. Since news of the jail break had been disseminated by the local media, it is possible some members of the jury had received such knowledge which prejudiced them."

Most of the alleged facts stated in defendant's sixth point are unsupported by the record. The transcript does show that immediately prior to the resumption of the trial on its second day the trial court, outside the hearing of the jury, told counsel for both sides that he "was informed by the sheriff's department that Mr. Preston was involved somehow in an occurrence last night." There ensued discussion concerning the need for additional security in the courtroom. Counsel for defendant specifically agreed to these measures. Defendant's counsel made no request that the jury be polled concerning the "occurrence," nor was there any showing that the occurrence, whatever it was, had been disseminated by the local media or that any member of the jury had received any knowledge, from the media or otherwise, concerning it.

 This type of objection, belatedly advanced, is akin to an objection based on a claim of misconduct on the part of a juror. When a claim of the latter sort is first presented in a motion for a new trial, an affirmative showing must be made that defendant and his counsel were ignorant of the fact until after the trial. *State v. Bollinger,* 560 S.W.2d 606, 608[3] (Mo.App. 1978).

 Defendant requests that the point be considered by this court under the "plain error rule," Rule 27.20(c). No error, plain or otherwise, appears. Disturbing the verdict and judgment on this basis would require the type of "surmise and speculation" discussed and condemned in *Cline v. Carthage Crushed Limestone Company,* 504 S.W.2d 102, 117[17] (Mo.1973). Defendant's sixth point has no merit.

The judgment is affirmed.

TITUS, J., and CAMPBELL, BARKER and HENRY, Special Judges, concur.