STATE of Missouri, Respondent,

v.

Willis R. CLARK, Appellant.

No. 60221.

Supreme Court of Missouri,
En Banc.

Dec. 6, 1979.

Rehearing Denied Jan. 15, 1980.

**710**

Robert G. Duncan, Kansas City, for appellant.

John Ashcroft, Atty. Gen., Philip M. Koppe, Asst. Atty. Gen., Kansas City, for respondent.

RENDLEN, Judge.

Defendant's conviction of murder in the first degree, § 559.010, RSMo 1969,[1] and sentence to life imprisonment were affirmed by the Court of Appeals, Kansas City (now Western District) in an opinion mistakenly published in 552 S.W.2d 256.[2] The cause was transferred here and comes to the writer on reassignment following reargument in the May term, 1979.

We must determine (1) if the "plain view" exception to the warrant requirement justified seizure of a desk calendar from appellant's home; (2) the admissibility of statements made to police by defendant after receiving *Miranda* warnings, (3) whether handwriting exemplars taken from appellant were admitted on proper foundation, and (4) did the admission of allegedly irrelevant and immaterial evidence require reversal. Deciding the questions as though on original appeal (Rule 83.09), we affirm.

Defendant Clark was convicted of murdering Charles Davis, maintenance superintendent of the Unity School of Christianity (Unity), in Jackson County on December 6, 1974. Clark had been employed at Unity from 1955 to 1968 in the maintenance section but his employment was terminated because of disagreements with the maintenance supervisor and because he was suspected of pilfering. In January, 1974, Clark, then employed in the Kansas City School System, wrote to the director of Unity expressing an interest in returning to work at the school. The maintenance supervisor with whom Clark had had difficulty was preparing to retire and Charles Davis, (the victim of this crime) was employed as his successor in April of that year. That

---

1. Common form first degree murder is now named "capital murder." § 565.001, RSMo 1978.

2. The notation in the style of the case at 552 S.W.2d 256, "Application to Transfer Denied July, 11, 1977" is incorrect. The application to transfer filed here June 13, 1977 was sustained September 12, 1977 and by operation of law the opinion of the Court of Appeals was vacated upon the transfer to this court. While it should not have been published, it remains in 552 S.W.2d and to avoid unnecessary repetition portions of the prior opinion have been incorporated herein by reference.

June, Clark interviewed with the Unity director and was told Davis had been hired for the job.

Mrs. Davis testified that her husband left the house about 7:45 p. m. on December 6, 1974, after he received a telephone call, which she had answered on an extension, from a man who claimed to be a state boiler inspector. Later she found a typed note on an index card, presumably made by her husband, a methodical man of notes and records, reading: "Boiler Inspector, State of Missouri, 12–6–74, 8:30 p. m. Spaulding." At approximately 11:00 that night Charles Davis was found shot to death on the floor of his office in the Unity shop building. The medical examiner placed the time of death between 9:00 and 10:00 p. m.

At approximately 8:30 that evening John Fines, a security officer at Unity, noticed a 1966 Ford parked on a gravel road leading into the Unity farm from Colburn Road. Examining the empty car he noted the license number and radioed the Unity operator requesting an identification check. The operator's log disclosed that inquiry was made at 8:30 p. m. to the state highway patrol concerning the license number and from that inquiry it was learned the plate had been issued to Willis Clark, Lee's Summit and that the vehicle had not been reported stolen.

Fines then drove to the Colburn Road entrance of Unity Village where he could watch the parked Ford. About ten or fifteen minutes later the lights came on, the car backed out and then drove east on Colburn Road at a high rate of speed. With his red lights flashing, Fines pursued for about two miles but was outdistanced and temporarily lost sight of the car. He soon found it stopped on the shoulder at the southeast corner of Independence and Colburn Roads with Clark standing alongside taking off a pair of jeans or coveralls. Radioing the Lee's Summit police for assistance, Fines then questioned Clark regarding his conduct. Clark denied having been

at Unity Village although the license number on his Ford was the same as the parked car checked a short time earlier near the Unity farm. Defendant then accused Fines of forcing him off the road. The Lee's Summit police came to the scene and after some discussion, Clark was allowed to proceed and returned to his house.

Meanwhile D. R. Armstrong, the inside security man, and C. R. Bray, a maintenance man, were working at Unity that evening. Bray saw Armstrong talking with Mr. Davis and testified that Davis had told him that he was staying late because he was expecting a boiler inspector that evening. Armstrong, after receiving a phone call from Davis at 8:00 p. m. asking him to turn on the boiler, worked in the buildings until 11:00 p. m., when he noticed the boiler was still activated and that Davis' door was open. It was then he discovered Mr. Davis' body and told the operator to call Fines. Fines testified that shortly after 11:00 p. m. he received an emergency call from the maintenance shop and going there saw Davis' body on the floor. The Jackson County Sheriff's Patrol was called and Fines told an officer of his encounter with Clark earlier that evening.

The police went to Clark's home in Lee's Summit at 1:00 a. m. on December 7, and advising him of his *Miranda* rights, requested that he accompany them to the police station for an interview either then or the following morning. Defendant called his attorney, William Collett, and then drove to the police station in his own car. Though he refused to sign a rights waiver form Clark talked freely with the officers.

Detective Sergeant Jack Morton of the Jackson County Sheriff's Patrol, one of the principal officers in charge of the investigation,[3] was called at 11:20 p. m. on December 6, twenty minutes following the discovery of the victim. Arriving in less than one-half hour he took charge of the murder scene investigation and Detective Bill Starr, ordered into the investigation early the

3. A Major Hatfield commanded the investigation; Sergeant Morton was second-in-command.

next morning, was directed to search the area near the intersection of Independence Avenue and Colburn Road where Fines had overtaken defendant's car. Arriving there about 7:15–7:30 a. m., he found many pieces of torn paper on a grassy field fifteen feet southeast of the intersection. One of the pieces bore the word "hello," another "state boiler," another the name "Spalding." Detective Starr put the scraps in an envelope which he sealed and delivered to Detective Morton at headquarters. Morton in turn delivered the envelope to John Cayton of the crime laboratory, who assembled these pieces, together with some additional pieces which had been given to him later in another envelope.[4] The assembled pieces constituted a page from a calendar which was introduced at trial as exhibit # 50 and has been submitted for our consideration. It is important to note that the unassembled pieces contained printed words and figures clearly identifying them for even the most casual observer—and Starr was an experienced detective—as parts of a page from a calendar.

At 9:00 a. m. on December 7, Morton obtained a warrant for the search of Clark's residence[5] and armed with that warrant went with Starr and other officers to defendant's home. Mrs. Clark at first objected to the search, but permitted them to proceed after calling attorney Collett, to whom Sergeant Morton explained that the police would not search the whole house if Mrs. Clark gave them the items in the warrant. While talking to Mr. Collett, Sergeant Morton who had earlier that morning received the calendar page scraps from

Starr, saw a desk calendar on the telephone stand in the family room. He described the calendar as a standard desk calendar, often found in a "great many offices."[6] Morton took the calendar with him. Two days later when Cayton pieced the paper fragments together it was found to be a complete calendar page for Thursday, October 24, 1974. At some unspecified time the police turned through the calendar pad taken from defendant's home and discovered the page, # 297, for October 24, 1974, was missing.

A continued search along Colburn Road produced an old "owl head" .32 caliber revolver near the intersection of Independence Road and close by a box with 15 rounds of .22 caliber shells. Later in the afternoon officers searching along Colburn Road not far from the Unity entrance found a .22 caliber Inver-Johnson revolver containing six spent shells and two live rounds. Subsequent ballistics tests showed that the slugs taken from Davis' body been fired from this weapon.

At the time of the murder, defendant taught building maintenance at the Kansas City Skills Center and going there the police found drill bits in his locker. Two of the fifteen bullets recovered in the ammunition box had been drilled in the nose and laboratory analysis disclosed that one of the drill bits from defendant's locker had been used to drill the holes. The trial court permitted the introduction of appellant's post-arrest statements and the physical evidence described above. Because there is no contention that the evidence was insuffi-

---

4. Cayton arranged the pieces on December 9, two days after their recovery. Before he received them, it appeared that someone had attempted to develop latent fingerprints on the fragments causing a slight purple stain on several of them. The separation of the pieces into two envelopes apparently occurred during the two days following their delivery in one envelope by Starr to Morton.

5. The warrant authorized seizure of "overalls, shoes and clothing of Willis Clark worn by the said Willis Clark on the night of December 6, 1974, when questioned by a security officer at Unity Village, Missouri; the small caliber rifles and pistols described by Willis Clark as being

in the residence at 411 Jefferson, Lee's Summit, Missouri and mud, dirt, blood stains, hair and other debris from the area of Unity Village, Missouri, near the maintenance building access road and Colburn Road", and then described Clark's house, car and garage as the places to be searched for these objects. No reference was made to a desk calendar.

6. Mrs. Clark testified the calendar was sometimes kept in the family room and sometimes in the kitchen and that her husband had another of the same kind in the basement where he had a desk and file cabinet.

cient to support the conviction, we need not detail all testimony adduced in support of the first degree murder charge; suffice it to say the evidence discussed above, taken with other incriminating testimony, made a strong case against defendant. The jury found appellant guilty of murder in the first degree and fixed punishment at life imprisonment. This appeal followed.

## I

Defendant's first point relates to the denial of his motion to quash the search warrant and to suppress the use of the desk calendar seized in the search of his home.

He contends the language of § 542.271, RSMo 1969 barring issuance of a warrant to search and seize private papers or business records forbad seizure of the desk calendar, but such objection is inapt because the calendar was not seized under a warrant.

However, defendant objects further, contending that even if the desk calendar were not a private paper or business record, his rights were violated by the seizure because it flowed from a warrantless search which, subject to only a few certain exceptions, are *per se* unreasonable under the fourth amendment. *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). He also contends the burden is on the state to show that the evidence fits within one of the exceptions to the otherwise *per se* requirement of a warrant for seizure of evidentiary items. *State v. Epperson,* 571 S.W.2d 260, 263 (Mo. banc 1978); *cert. denied,* 442 U.S. 909, 99 S.Ct. 2820, 61 L.Ed.2d 274 (1979); *McDonald v. United States,* 335 U.S. 451, 456, 69 S.Ct. 191, 93 L.Ed. 153 (1948); *United States v. Jeffers,* 342 U.S. 48, 51, 72 S.Ct. 93, 96 L.Ed. 59 (1951). The state replies that the calendar was both in "plain view" and was "reasonably related" to the purpose of the search and thus its seizure was proper.

The plain view doctrine was discussed at length in *State v. Collett,* 542 S.W.2d 783 (Mo. banc 1976), wherein this Court at 786 reviewing *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) stated: "[*Coolidge*] is authority for the proposition that plain view alone is not enough to justify a warrantless seizure. It is necessary that (1) the evidence be observed in plain view while the officer is in a place where he has a right to be, (2) the discovery of the evidence be inadvertent and (3) it is apparent to the police that they have evidence before them." The first "*Coolidge*" requirement was met because Sergeant Morton could see the desk calendar in plain view and there is no question that the police had justification under the valid warrant to enter defendant's home. Examining to see if the elements of requirement # 3 were present we must ask whether detectives Morton and Starr could reasonably believe that the calendar pad discovered in plain view was evidence relating to criminal activity.

We start with exhibit # 50, submitted for this Court's consideration, the pieces of which Starr found shortly before he assisted Morton in executing the warrant. Starr testified that he could discern the handwritten words "hello," "stateboiler," and "Spaulding" when he was gathering the fragments. Examination of the exhibit readily discloses that it is a page from a desk calendar pad with a number of irregular pieces assembled into a page approximately 3½ by 6 inches. Tear lines delineating the separate pieces are for the most part easily discerned. One of the larger pieces bears all but the "T" from the word "Thursday," printed in bold black capital letters. Another large piece shows on its right side in even larger print a red "2" and half the "4" from "24," and on its left side the smaller printed numerals "10" and "17" in one vertical column, the numerals "4," "11," and "18" in the next column, and the letter "S" over the numerals "5," "12," "19," and "26" in a third column, with a straight vertical line suggesting a border. The fragment containing the word "hello," to which Starr testified, bears the black printed numerals "29," "30," and "31" partially enclosed in a black line border clearly depicting a portion of calendar. This fragment fits with the one on which the columns of numbers are shown. These two

large pieces with several smaller fragments display portions of a calendar portraying the month of October, 1974, enclosed by a black line border. Four assembled fragments, including one described above, show a large red "24" and "Oct. 1974" in the upper right hand corner of the page. The pieces at the bottom bear the following printed words and figures: "297—Thursday, Oct. 24—68." [7] The assembled calendar page bears a handwritten note which reads,

> "Hello—Lazier Spalding of the State Dept. of Boiler Inspection. The Unity operator gave me your number. I meant to get in touch with you earlier at home relative to inspection [sic] the two new boilers in the shop area but I had car trouble and my car has been worked on all afternoon. I would like to head home this evening if I could make the inspection. Take just 45."

While it was necessary to assemble the parts to read all the printed and handwritten matters on the paper, any two or three of the larger pieces when considered separately, without question indicate they are parts of a page from a small calendar.

Starr's examination of the paper scraps was intense and purposeful. He was sent to search for evidence at the place where the suspect was first seen and accosted outside his car following the chase from Unity farm by Officer Fine. Starr found and collected the scraps in the grassy area near that intersection. In this thorough search he discovered and retrieved *all* the fragments. While Starr was not asked particularly about the printed material on the paper pieces, he was able to identify *the* fragments when assembled as comprising *the* exhibit. This could only have been possible from his recognition of the separate fragments with the printed numbers and letters as well as the handwritten portions which he described.

Starr's testimony demonstrates the significance he attached to the paper pieces.

Q. At the time you recovered the pieces of paper, which is State's Exhibit No. 50, is that the only thing you recovered at that time?

A. [Officer Starr] Yes, at that time.

Q. *And did you immediately deliver those to Sergeant Morton?*

A. *Yes, I did.*

Q. Then, I take it, you returned back to the scene of Independence and Colburn; is that correct?

A. Yes, I did. (T. 270) (Emphasis added.)

Starr stopped his search immediately, made a special trip to deliver the find to Sergeant Morton and shortly thereafter accompanied Sergeant Morton to the Clark residence. Although the record does not reflect what he told Morton about the paper fragments. Starr at that time carried his knowledge of the fragments with the printed numbers and letters to the Clark home. It may reasonably be concluded that from this knowledge the officers recognized a connection between the calendar pad and the crime they were investigating when the pad was spotted by Morton on the telephone stand in defendant's home. It defies credulity to suggest that Morton had not been advised by Starr of his finding the calendar scraps, for this is the principal fact explaining his recognition of the probable significance of the desk calendar and its seizure.

It is not correct, as defendant argues, that only when the police later discovered a page missing could a nexus between the calendar and the crime appear. The circumstances tell us otherwise. A similar fact situation was analyzed by the Illinois Court in *People v. Caruso*, 2 Ill.App.3d 80, 276 N.E.2d 112 (1971), involving the seizure of papers in defendant's home. FBI agents entered the home pursuant to a search warrant for stolen property. One of the agents, while eavesdropping, listened in on two phone calls which came to the residence during the search and overheard persons ask about "the results" and about "9–4–2 in the tenth." He then observed defendant in a rear bedroom. A desk in the room contained racing forms, newspapers, and slips

---

7. October 24 is the 297th day of the year, with 68 days remaining.

of paper with numbers on them. The local police were called and informed of the phone conversations but not of the papers. When they arrived, they observed newspapers and racing forms on the desk top and noticed scraps of paper immersed in the liquid contents of an electric blender in the room. Although they did not know what was on the scraps in the blender, they seized them as well as the other papers. On the State's appeal from the pretrial order suppressing the scraps of paper, the appellate court reversed, stating, "The inability of police officers to positively identify slips of paper as record evidence of bets does not render a seizure unlawful where surrounding circumstances give rise to a reasonable belief that such slips of paper constitute evidence of a crime." 276 N.E.2d at 113.

The fact that further examination of the calendar pad was required to corroborate Morton's belief and confirm its probative quality did not render the seizure a violation of defendant's fourth amendment rights. We find the standards of the doctrine's third requirement have been met.

■ Finally we consider the 2nd requirement, i.e., the discovery must be inadvertent. Defendant contends that Morton, having advance knowledge of the probable connection of the scraps of paper found by Starr with the crime under investigation, could not have discovered the calendar pad inadvertently. This argument fails because Morton had no probable cause to believe a desk calendar pad was the source of the scraps or that it would be found at defendant's residence. While it is reasonable to assume that Morton knew at the time he obtained the warrant that the scraps probably represented a part of a calendar, nothing supports the assumption that he realized the unassembled scraps represented a page from a desk calendar or that such, if it existed, might be in defendant's home. It was necessary for one additional fact to come to light, i.e., the discovery in plain view of the desk calendar to combine with the other facts then known to trigger Morton's appreciation of the calendar pad's probable evidentiary value.

The Court of Appeals in the well reasoned opinion of State v. Preston, 583 S.W.2d 577 (Mo.App.1979), discussed United States v. Hare, 589 F.2d 1291 (6th Cir. 1979). There the United States Circuit Court of Appeals carefully analyzed Coolidge v. New Hampshire, supra, pointing out that the Supreme Court in Coolidge did not define the term "inadvertent," and that the term was used in the sense of "unintentional" rather than "unanticipated." The Court in Hare at 1294 stated, "We conclude, then, that 'inadvertence' in this context means that the police must be without probable cause to believe evidence would be discovered until they actually observe it in the course of an otherwise-justified search. There are many times when a police officer may 'expect' to find evidence in a particular place, and that expectation may range from a weak hunch to a strong suspicion. However, the Fourth Amendment prohibits either a warrant to issue or a search based on such an expectation. Yet if in the course of an intrusion wholly authorized by another legitimate purpose, that hunch or suspicion is confirmed by an actual observation, the police are in precisely the same position as if they were taken wholly by surprise by the discovery. The same exigent circumstances exist, and no warrant could have been obtained before the discovery." We are persuaded to this view but whether a standard of "unintentional" or "unanticipated" is applied, before the officers entered defendant's residence they did not know if a calendar existed nor that a desk calendar was the source of the scraps. As in Preston, any expectation they had amounted only to a "weak hunch" or certainly no more than a "strong suspicion." The evidence shows Morton's discovery of the pad was inadvertent and defendant's first allegation of error is denied.

## II.

■ Defendant next contends that the introduction of the testimony as to his in-custody statements made to the police officers was violative of the requirements imposed by Miranda v. Arizona, 384 U.S. 436,

86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and that following an evidentiary hearing on his motion to suppress, the Court erred in denying the motion. As noted above, the opinion of the Court of Appeals, Kansas City District, was mistakenly published in the official reports at 552 S.W.2d 256. To avoid duplication we adopt that portion of the opinion beginning with the last paragraph on page 261 (which commences with the words, "Appellant's second assignment of error is . . . .") and ending with the 5th full paragraph on page 263 which reads, "Appellant has not demonstrated error in the trial court's ruling on his motion to suppress the results of his custodial interrogation or in the admission of such evidence at his trial." To this we add that under prior decisions of this court, a waiver of the right to remain silent need not take any particular form. It need not be in writing; nor is it necessary that it be expressed in words specifically stating that the right to remain silent is being waived. A waiver of such right or the right to counsel can be determined from all of the surrounding circumstances. A similar statement of the rule may be found in *United States v. Zamarripa*, 544 F.2d 978, 981 (8th Cir. 1976), *cert. denied*, 429 U.S. 1111, 97 S.Ct. 1149, 51 L.Ed.2d 566 (1977):

> The fact that the defendant did not sign the waiver form does not, per se, defeat the validity of a waiver of constitutional rights; the holding in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), requires that a waiver of rights be made voluntarily, knowingly and intelligently, but does not demand that it be made in writing. (Citations omitted.) A voluntary waiver need not assume any particular form; it may be made in writing on a printed format or it may be made orally in replying to questions as in this case.

The most recent affirmation of this rule is found in *North Carolina v. Butler*, 441 U.S. 369, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979), wherein the Court stated, "An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver. The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case." Clark obviously understood his rights as related to him in the *Miranda* warning. In fact, he acted thereon, contacting and talking to his attorney. After consulting with his attorney and informing him that the officers wanted him to come to headquarters to talk about the Charles Davis homicide, he went to headquarters in his own automobile. At that time he was not under arrest. Upon his arrival at the police station, he again was given the *Miranda* warning. His refusal to sign a waiver on his attorney's advice demonstrates he also understood and acted on that advice. At no time did he state that he had been advised not to talk to officers and he asserted no objection to making oral explanations. The officers testified that he talked freely and voluntarily.

■ Defendant did not testify at the suppression hearing and there was no evidence to contradict testimony of the officers. Nothing in the record suggests any intimidation or coercion or mistreatment. The evidence was sufficient to indicate that defendant, with knowledge of his right to remain silent, voluntarily and intelligently waived that right by freely talking and answering questions. The trial court was justified in denying the motion to suppress and concluding that the statements of defendant were admissible.

### III

Pursuant to court order, defendant submitted certain handwriting exemplars for comparison with the writing found on the fragments from the calendar page. In addition, his handwritten letter to the president of Unity received in late January, 1974, and two papers signed by Clark and taken from his personnel file at Unity were compared to the handwriting on the calendar page. Although the State's handwriting expert testified the court-ordered ex-

emplars "had been produced in an altered form in an attempt to disguise normal handwriting," he was able to conclude after comparing the handwriting on Clark's letter of January, 1974 with that on the calendar page, that Clark had written the message on the latter. The handwriting on the documents from Clark's personnel file buttressed the expert's conclusions. The defense objection to introduction of the letter and the two personnel documents was grounded solely on the claim there was no proof whose handwriting appeared on those papers.

Defendant however argues that the three standards or exemplars of his purported handwriting (not those ordered by the trial court) were admitted without proper foundation as no one testified directly that the signature on any of the three was that of defendant. Section 490.640, RSMo 1969, provides:

> Comparison of a disputed writing with any writing proved to the satisfaction of the judge to be genuine shall be permitted to be made by witnesses, and such writings and the evidence of witnesses respecting the same may be submitted to the court and jury as evidence of the genuineness or otherwise of the writing in dispute.

Here, the judge admitted the specimens, indicating his satisfaction with the proof of their genuineness. *State v. Pace*, 269 Mo. 681, 192 S.W. 428, 431 (1917). There was extensive circumstantial evidence of exhibit No. 107's authenticity, a letter purportedly written to the Unity president (then Unity director) by the defendant, including the fact that in response thereto the president granted Clark an interview and the fact that defendant admitted he had written such a letter and was familiar with its contents. In addition, defendant's objection when the letter was introduced was only to its relevance not its authenticity.

■ The other two documents were also competent as standards. One was an application for employment and the second a

personal information form, with directions that it be written in the employee's hand, was written in longhand and signed with defendant's name. Outward indicia of reliability, such as the document's age, presence in defendant's file and the use of the first person, were also indicative of genuineness. Normally one proposed standard cannot be used to prove the genuineness of another. To so permit would allow one document of unproven validity to validate a second, and no check would be provided if both are in fact false, yet written by the same hand. See Annot., 41 A.L.R.2d 575 (1955) and cases cited. However, when one of the proposed standards is proved to the satisfaction of the court to be genuine, expert testimony that it was in the same handwriting as the other is competent to permit that the latter be used as standards. See *Estate of Fedina*, 491 S.W.2d 552, 558, 559 (Mo.1973).

■ Thus, when exhibit No. 107 was proved genuine, it could be used to prove the other's authenticity and the trial judge, within his discretion, properly admitted the documents.[8]

### IV.

Defendant asserts a number of additional allegations of error not properly preserved for review because the "points" set forth in appellant's brief contain no more than conclusory statements, falling far short of Rule 84.04(d)'s requirements for preservation of error. In a case published since the first argument and submission in this case, *Thummel v. King*, 570 S.W.2d 679 (Mo. banc 1978), we reiterated the importance of compliance with these rules. However, though improperly presented we have examined the point for plain error.

■ Defendant ascribes error to admitting the .32-caliber pistol, the box of .22 caliber shells, and the drill bits, asserting that "all the testimony regarding the finding, seizure and comparison of said exhibits was irrelevant, immaterial, and not con-

---

8. See the Missouri Court of Appeals opinion 552 S.W.2d 256, pages 263 267 for a full and careful analysis of the applicable law and facts dispositive of this issue.

nected with and proven activity of defendant [sic]." The laboratory tests matching Clark's drill bits with the holes bored in two of the .22 caliber bullets, link Clark to the bullets and go to the proof of preparation and premeditation. The claim concerning the shells and drill bits is without merit. Furthermore, defense counsel in cross-examination of Detective Harl Morris adverted to defendant's statement to the police that he owned a five-shot .32 caliber weapon, and the State produced a witness, Mr. Clarence Connor, who testified the .32 caliber owl-head revolver in question appeared to be the gun he had given defendant several years prior to the homicide. The connection between the weapons and defendant's attempt to dispose of them along the road was sufficiently established.

■ Defendant next contends the note on the index card found by Mrs. Davis was not shown to have been typed by the victim on the evening of his death. If defendant is claiming—and it is not clear from his brief—that the exhibit should not have been admitted in evidence, the point is not well taken because counsel made no objection at trial.[9] If defendant is arguing that Mrs. Davis' conclusion as to when her husband typed the note was not trustworthy, his argument goes to the weight of the evidence rather than its admissibility, a matter put to rest by the verdict.

■ Defendant further asserts that the State violated the criminal discovery requirements of Rule 25.32 by failing to disclose before trial the tests on the Hilti gun [10] and the documents from appellant's personnel file at Unity. Rule 25.32 lists certain items discoverable from the State without court order "upon written request of defendant's counsel." Nothing in the

record, including appellant's "motion for production" therein, shows counsel made written request for such items required by the Rule. The point is overruled.

■ Finally, appellant urges that the judge erred in sustaining the State's hearsay objection to a defense question to maintenance worker Bray about a conversation with Officer Fines regarding Fines' chase of Clark's auto. The following occurred during the defense cross-examination of Fines:

Q. All right. Now, did you ever tell a Mr. Gray [sic] that you were not sure if the car that was there at Independence and Colburn Road was the same car that you observed back at Unity?

A. I don't know Mr. Gray.

Q. He is a janitor there at Unity.

A. I don't recall. (Tr. 187–188)

Later the defense called Bray to the stand, who on cross-examination testified that Fines had told him of seeing an empty vehicle on the Unity grounds and of later chasing it as it sped away from Unity. On redirect, the following appears:

Q. So he saw the automobile, checked it, then drove away, and then came back?

A. Yes.

Q. And did he tell you whether or not after he stopped the car, after the chase, whether or not he was sure that that was the same car?

MR. DAKOPOLOS: Well, I object to that, Your Honor, as calling for hearsay evidence.

THE COURT: Sustained. (T. 706)

Defendant now argues that the objected-to question represented proper impeach-

9. Counsel twice objected to Mrs. Davis' testimony that the note must have been prepared the evening of her husband's death, but did not object to the introduction of the index card itself.

10. A gunshot residue test performed on samples swabbed from Clark's hands about 3:00 a. m. the day he was arrested revealed that he had recently handled and discharged a firearm. A gunpowder residue test was later performed in connection with a "Hilti gun," a device that fixes nails or rivets into concrete, and the results showed that device did not leave the residue found on Clark's hands. Defense counsel objected to the introduction of the later residue test on the ground the State had not revealed it to the defense prior to trial. Responding to this the prosecutor explained the test had only been completed the preceding day and with no opportunity to furnish it earlier.

ment of Fines' previous testimony by a prior inconsistent statement. This argument faces numerous difficulties. First is the apparent misidentification by defense counsel who asked Fines about Mr. *Gray* and then presented a question to Mr. *Bray* concerning the alleged statement. Next, no proffer was made of the supposed answer Bray might make. Finally, the matter is at the most inconsequential. The State linked appellant to the crime through the license check made by Fines, ballistics tests, the other guns found not far from Unity, the content of the two notes, one of which was taken from the deceased's home and the other from the fragments of paper found on the chase route shown to have been written by Clark. Defense counsel's question could go only to Fines' original identification of the Ford. This original identification was corroborated by the requested license check and by his later identification of the Ford car he stopped at Independence and Colburn Roads. Further, there is no dispute that it was Clark who was stopped at the intersection near Unity Village between 8:30 and 9:00 p. m. on the night of the murder and who engaged in the colloquy with Fines and the Lee's Summit police and it was the Ford car which bore the license plate that Fines saw and requested the I.D. check *before* the chase began. The answer, on this tangential point, could have no significant impact on the volume of credible evidence linking Clark to the place and time hereinbefore discussed. "[E]rror which in a close case might call for a reversal may be disregarded as harmless when the evidence of guilt is strong." *State v. DeGraffenreid,* 477 S.W.2d 57, 65 (Mo. banc 1972). We do not imply that if this were a close case reversal would be required; we hold only that if any error occurred in the judge's ruling on this point—and it does not so appear—it was harmless beyond a reasonable doubt. *A fortiori* no miscarriage of justice constituting plain error can be said to have occurred.

The judgment of the circuit court of Jackson County is affirmed.

WELLIVER and MORGAN, JJ., and FINCH, Sr., J., concur.

DONNELLY, J., dissents in separate dissenting opinion filed.

SEILER, J., dissents in separate dissenting opinion filed.

BARDGETT, C. J., dissents and concurs in separate dissenting opinion of SEILER, J.

HIGGINS, J., not participating because not a member of the Court when cause was submitted.

DONNELLY, Judge, dissenting.

The United States Supreme Court, in *Miranda v. Arizona,* 384 U.S. 436, 444–445, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966) held that, in the context of custodial interrogation, "to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it, the following measures are required. Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him."

This case again presents the problem of determining whether the accused, after being informed of his rights to silence and an attorney, voluntarily, knowingly and intelligently waived those rights. The United States Supreme Court has ruled that, "the question of waiver must be determined on 'the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'" *North Carolina v. Butler,* 441 U.S. 369, 99 S.Ct. 1755, 1758, 60 L.Ed.2d

286 (1979). The Court rejected North Carolina's interpretation of the *Miranda* rule which would have required an explicit waiver of the rights to remain silent and to have an attorney. Rather, the Court said, waiver may be inferred from the actions and words of the person interrogated.

The Court in *Butler, supra,* said it could see no reason to require a standard of explicit waiver rather than one of inferring waiver from all the circumstances. In my opinion, there are good reasons for requiring an explicit waiver from the point of view of both the accused and the state.

"Two major policies would be served by requiring an express, affirmative statement of waiver in all cases as an absolute prerequisite to admissibility. First, since police interrogators would be required to ask for a statement of waiver if the suspect did not volunteer one, such a requirement would advance the goal of assuring that the suspect is made aware of 'his interrogators' willingness to recognize his rights should he choose to exercise them.' Second, although a 'boilerplate statement' of waiver may not be sufficient in itself to establish the validity of a waiver, since such a statement could always be the result of coercion, ignorance, or diminished intelligence, the presence of an affirmative statement would be a readily ascertainable fact, which would substantially lessen the burden of the reviewing court, particularly in cases where the suspect exhibits inconsistencies or vacillating intentions at the interrogation." *Note, Waiver of Rights in Police Interrogations: Miranda in the Lower Courts,* 36 U. of Chi.L.Rev. 413, 426 (1969).

In *Commonwealth v. Bussey,* —— Pa. ——, 404 A.2d 1309, 1314–1315 (1979), the Supreme Court of Pennsylvania held an explicit waiver of *Miranda* rights mandatory under the Pennsylvania Constitution, and said:

"Our ruling, unlike *North Carolina v. Butler, supra,* will promote certainty in knowing an accused has waived his rights and will avoid a mountain of litigation which might otherwise result from trying to determine what 'implicitly' went on in an accused's mind. * * * Our ruling will also serve to impress on an accused the importance of his decision. Furthermore, assuming *North Carolina v. Butler, supra,* was concerned with additional burdens being placed on law enforcement officials, given *Miranda,* we cannot agree our ruling creates any such burden. Surely if the rights must be explained, merely asking for an answer to a question is no great burden, and even if it is a burden, it will promote certainty in the law and, thereby, eliminate a greater burden resulting from allowing implicit waivers."

The *inferential* approach of the United States Supreme Court is fraught with ambiguity. It threatens the accused with an unknowing waiver born of confusion and uncertainty. It requires of the courts and police a psychological acumen for which they are not trained and which they are in no position to exercise.

The United States Supreme Court has made it clear, however, that this Court, as the highest state court of Missouri, is not permitted to entertain an interpretation of the United States Constitution which varies from rulings of the United States Supreme Court. The United States Constitution may not be interpreted to require an express waiver of the right to remain silent and to the assistance of an attorney. The holding in *Butler, supra,* is not equivocal; the Court's power to interpret the United States Constitution shall be *unshared* and *ultimate.* How could this have happened in America? The curious can read Eric Hoffer's *The True Believer.* Then they will understand.

In my view, the Constitution of the United States sets the outer limits of the powers delegated by the people to their agents in The Legislative Department (Art. I), The Executive Department (Art. II), and The Judicial Department (Art. III) of the Federal Government. I find support for this view in the Preamble to the Constitution of the United States and in The Declaration of

Independence which declares, as I read it, that even members of The Judicial Department may exercise only those powers which derive "from the consent of the governed." And, "it is always safe to read the letter of the Constitution in the spirit of the Declaration of Independence." *Gulf, Colorado & Santa Fe Railway Company v. Ellis*, 165 U.S. 150, 160, 17 S.Ct. 255, 258–259, 41 L.Ed. 666 (1897).

History tells us that the Framers, in establishing a Federal Government, were influenced by the teachings of Aristotle, Locke, Rousseau, and others, and by the *social contract* concept they espoused. This concept would recognize a continuing right in the people to call their agents, even the United States Supreme Court, to account. It would assure that the people, and not an agency of government, will determine the direction of their lives. If, in fact, our National Government is exercising powers without the consent of the governed—the people—then the rights it purports to secure in their name are counterfeit—its benevolence is a fraud.

Where, then, do we find a delegation of power by the people to the United States Supreme Court to declare "the supreme Law of the Land" under Article VI of the United States Constitution? Where do we find "the consent of the governed"?

In *Marbury v. Madison*, 1 Cranch 137, 177, 2 L.Ed. 60 (1803), Chief Justice Marshall expressed the Court's view that "It is emphatically the province and duty of the judicial department to say what the law is." In *Cooper v. Aaron*, 358 U.S. 1, 18, 78 S.Ct. 1401, 1410, 3 L.Ed.2d 5 (1958), the Court enlarged upon Marshall's dictum, declared itself the ultimate arbiter of constitutional disputes in the Nation, and pronounced that its interpretation of the Fourteenth Amendment "is the supreme law of the land; and Art. VI of the Constitution makes it of binding effect on the States * * *."

If, as I believe, the people are sovereign, the question narrows: may the power to bind a principal (the people) come from the agent (the Supreme Court) or must it come from the principal (the people)? Of course,

it must come from the people. If the people desire that the Supreme Court be given the power to declare "the supreme law of the land", Article V of the Constitution provides the vehicle for change. The assertion of power in *Cooper, supra*, is self-serving and substanceless.

During the past several months, I have sought to inform the people of Missouri of the arrogations of the federal judiciary. *See Seales v. State*, 580 S.W.2d 733, 739 (1979); *Baker v. State*, 584 S.W.2d 65, 69 (1979); and *State v. Handley*, 585 S.W.2d 458, 465 (1979). I will say no more about it.

To return to the case before us: I would hold, under Mo.Const. art. I, § 10, that no statement made by an accused in response to custodial interrogation may be used against him at trial unless the statement was made within a reasonable time after the accused was informed of his *Miranda* rights and signed a *writing* waiving those rights and consenting to interrogation without an attorney. If a written waiver is introduced in evidence, I would hold that the prosecution has met its burden of showing a voluntary, knowing and intelligent waiver. The waiver could be voided if obtained by coercion or because of incapacity or diminished intelligence. The accused could revoke the waiver by an express request to halt questioning or for an attorney, rendering any statements made after the revocation inadmissible. But I would place the burden of showing the invalidity or revocation of the written waiver on the accused. Resolution of these issues should be had by pre-trial motion and hearing. I would view the question whether the procedure by which a statement is obtained violates due process as a separate pre-trial issue. The focus would then be on the acceptability of the procedures used *and* on whether the statement was voluntary. *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964); *State v. Bradford*, 262 S.W.2d 584 (Mo.1953). In my view, a resolution of the former would make the problem of the latter less intractable.

The General Assembly has recognized the value of a written waiver of a defendant's constitutional rights in similar circumstances. Section 600.051, RSMo 1978 requires that any waiver of counsel in a criminal case which may result in punishment by confinement be made by a writing signed before and witnessed by the judge or clerk of court. This provision is strictly enforced. *Peterson v. State*, 572 S.W.2d 475 (Mo.banc 1978). The requirement of a written waiver is thus not unwarranted departure from accepted procedures for relinquishment of constitutional rights. Neither should it prove onerous to the interrogators as it is presently often used. *See State v. Phillips*, 563 S.W.2d 47 (Mo.banc 1978); *State v. Ford*, 495 S.W.2d 408 (Mo.banc 1973); *State v. Alewine*, 474 S.W.2d 848 (Mo.1971).

I would reverse and remand for new trial.

I respectfully dissent.

SEILER, Judge, dissenting.

I respectfully dissent. The loose-leaf desk calendar, Exhibit 48, was not described in the search warrant. Its warrantless seizure was therefore *per se* unreasonable under the Fourth Amendment, as the principal opinion concedes, unless it can be brought under one of the exceptions. The state carries a heavy burden to show that the seizing of the desk calendar falls within the particular exception. *Coolidge v. New Hampshire*, 403 U.S. 443, 455, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Vale v. Louisiana*, 399 U.S. 30, 34, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970). This, for the reasons set forth below, the state does not succeed in doing, and the case should therefore be reversed and remanded, as we cannot say beyond a reasonable doubt that the jury verdict was not influenced by the desk calendar. The jury indubitably was influenced in the weight it attached to the handwriting evidence as to the authorship of Exhibit 50, the handwritten note, by the fact that the calendar from which the note apparently came was found in defendant's home.

The principal opinion upholds the seizure and admission of the desk calendar in evidence on the plain view doctrine, saying that it was apparent to the police they had evidence before them incriminating the defendant and the discovery of the evidence was inadvertent.[1]

In hindsight, after the pieces of paper were assembled by technician Cayton two

---

1. It is important that we understand exactly what sort of object the desk calendar in question is. While counsel have been unable to locate and to produce it for our examination (it was an exhibit at the trial) I am confident it is the kind of book-type desk calendar in common use on desks everywhere and that virtually every reader of this opinion has seen and used such a desk calendar many times. Sgt. Morton described it as a "standard desk calendar," found in "a great many offices." From the calendar page before us, Exhibit 50, with the two uniformly sized perforations on the left margin, the page being approximately 3½ inches wide and 6 inches long, we can see that the desk calendar in question is the loose-leaf book type, where the pages are arranged in proper sequence, from the first to the last day of the year. The calendar for the entire month of October is in the upper left corner of the page in a space, about 1¼ inches square, with the day of the week, Thursday, at the top of the page and the date—24—in large red numbers at the top right and the month and year in smaller black letters just below the date. The remainder of the page is blank (except that in our case it has been written on), save at the bottom of the page, where the date—Thursday,

October 24—again appears with the figure 297 at the lower left corner and 68 at the lower right corner. Starting on the right hand side (as shown by the position of the perforations in Exhibit 50), the pages are turned to the left, book fashion, sliding on two rings or arches. As the year progresses, the pile of pages on the right diminishes and that on the left increases. What a person sees when he looks at such a calendar is the page for whatever date to which it is open. He does not see any of the other pages or dates. Assuming that defendant's desk calendar was kept current, which would be the normal practice (the state, which has the burden of proof offered no evidence to the contrary) the desk calendar would have been open to December 7, 1974 when Morton seized it, and the page for October 24, 1974 (or the absence of said page) would be out of sight, buried beneath the pages for the 44 days which had passed in the interim, completely out of view. Even if the desk calendar were not open to December 7, 1974, the state conceded it was not open to where the page for October 24, 1974 should have been. In other words, Sgt. Morton could not tell when he saw the desk calendar whether the page for October 24, 1974 was missing or not.

days after the crime, and as we see his work before us in Exhibit 50, it is easy to see that what we have is a page for Thursday, October 24, 1974, from a loose-leaf book type desk calendar, about three and one half by six inches in size, with two uniformly sized perforations near the left margin to accommodate the two rings by which the separate sheets of such desk calendars are held in loose-leaf sequence. The hand-written message is on this sheet.

However, Sgt. Morton, who seized the desk calendar, did not have the page before him in assembled form. All he had was the disjointed scraps of paper brought to him by detective Starr. Even so, the principal opinion states "[A]ny two or three of the larger pieces when considered separately, without question indicate they are parts of a page from a small calendar." The principal opinion states further: "It is important to note that the unassembled pieces contained printed words and figures clearly identifying them for even the most casual observer . . . as parts of a page from a calendar" and points out that the pieces showed the date October 24, 1974. The two uniformly sized perforations, mentioned earlier for the binder or arch rings on a loose-leaf book-type desk calendar, are also plain to be seen in two of the pieces of paper.

Yet the principal opinion, after concluding that it was apparent to Morton when he saw the calendar that he had evidence before him incriminating the defendant because of what is set forth above, then states that "Morton had no probable cause to believe a desk calendar pad was the source of the scraps" and that "nothing supports the assumption that he realized that the unassembled scraps represented a page from a desk calendar . . .", so it is asserted, the discovery of the evidence was inadvertent.

It is difficult to understand how Morton could have no idea the scraps were from a desk calendar and at the same time recognize instantly that the desk calendar on the telephone stand in defendant's house was evidence incriminating the defendant. No

explanation of this contradiction is offered. The state cannot have it both ways.

As stated earlier, in hindsight, with all the facts before us, knowing as we do now that the page for October 24, 1974 was missing from the desk calendar, it is easy to see a connection between the scraps and Exhibit 50, the desk calendar. But Morton did not have all these facts, and for us to look at it as though he did is to use the results of the seizure to justify it in the first place. This approach would do away with probable cause and permit police to justify any search on the basis of what they found during its course.

Morton testified that Starr accompanied him when Morton obtained the search warrant. So presumably Morton knew about the scraps of paper at that time, which was shortly before 9:00 a. m. according to his testimony. As the principal opinion states, when Starr found the scraps of paper he immediately took them to Morton. Yet Morton testified that he obtained the search warrant not because of anything he learned from Starr, but as a result of his earlier conversations that morning with defendant at the police station, where no mention had been made by defendant or anyone else about scraps of paper. The question was asked Mortion: "Now, as a result of your conversation with Mr. Clark earlier that morning on the 7th, did you obtain a search warrant?", to which he replied, "Yes, sir; I did."

When Morton was questioned as to why he seized the desk calendar, he did not advance any of the reasons discussed or deductions drawn in the opinions herein. The question was asked: "And while this conversation was taking place in the family room [the examiner was referring to the conversation between Morton and defendant's wife], what, if anything, did you observe that led you to believe, might be connected with this crime?", to which he answered, "A desk calendar pad that was setting [sic] on the telephone stand." No further statement appears in the record as to why Morton believed the calendar pad "might" be connected with the crime.

There would be no limit to what the officers could seize for later scrutiny if all the officer need do is to think it "might" be connected with the crime and then later, if it turns out that he was correct, thereby justify the seizure. Morton's "might" as the basis for seizing the calendar is the equivalent of a "hunch" or a "stab in the dark." His hunch turned out to be remarkably prescient, but the courts cannot determine search and seizure questions on the basis of rewarding a police officer whenever he has a lucky hunch. If that is to be the standard, we can forget about probable cause.

The point I am trying to make is further demonstrated by the fact that when the state offered the desk calendar, Exhibit 48, in evidence, it did so not on the basis that it was simply a desk calendar (which is what Morton seized) but on the basis that it was a desk calendar with the page for October 24 missing (which Morton could not have seen or known when he seized it). Something more had to be done with the calendar before the state could use it—the pages had to be turned, it had to be opened and the missing page uncovered. This is equivalent to seizing a billfold which is in plain view and then opening the billfold, searching it, and using the contents against the defendant. The courts have held this is not permissible. See United States v. Berenguer, 562 F.2d 206, 210 (2d Cir. 1977), a narcotics prosecution, where defendant was arrested in his apartment and the agents seized a billfold lying on a bureau. The agents opened the billfold and found $3200 in $100 bills. The trial court permitted introduction of the bills against defendant, under the plain view doctrine. On appeal, the court held it was error to admit the bills, citing Coolidge v. New Hampshire, supra, saying at 562 F.2d 210: "It is the third requirement [of Coolidge] that is clearly missing in this case. The billfold offered no immediately apparent evidence of an inculpatory nature. It was only after the billfold itself had been searched that the large denomination currency was revealed . . . ."

It may appear to be a fine line to draw here between the desk calendar as Morton seized it and the desk calendar as it was offered in evidence to show the missing page, but there is an important interest to every citizen in requiring that the state cannot make a warrantless seizure unless the object seized clearly comes within one of the permissible exceptions. Here the calendar did not.

The difficulty with the state's position in this case is the undeniable fact that the desk calendar, resting on the telephone stand, in defendant's home, was an entirely innocuous and neutral object, not in any way indicating any criminal activity on the part of the defendant. There was nothing about it as it sat there to indicate that the page for October 24 was missing and without that the desk calendar was of no significance. To be incriminating evidence the calendar had to be one with a particular page missing. Its apparent innocuousness is clear when we consider that had it contained a page for October 24 it would have had no significance whatever, yet it would not have looked any different to Morton when he spotted it on the telephone stand.

It is conceded that not until much later, when the crime laboratory people riffled through the pages of the calendar, was it discovered that the page for October 24, 1974 was missing. No contention is made by the state that as part of the plain view of the desk calendar by Morton on the telephone stand he could see that the critical page, October 24, 1974, was missing. In the course of the search for the articles mentioned in the search warrant, Morton saw the desk calendar, but not its contents. That required thumbing through the calendar, which did not occur until at least two days later, after technician Cayton had assembled the pieces as they now appear in Exhibit 48. Cayton testified that he was the one who examined the calendar as to whether there were any missing pages in it. He said that he found several pages missing, one of which, October 24, 1974, "was missing as you open the calendar."

The principal opinion attaches no significance to the fact that further examination of the calendar pad was required to establish its probative quality. The only authority cited in support of this position is *People v. Caruso*, 2 Ill.App.3d 80, 276 N.E.2d 112 (1971), but the facts in that case are far from similar to the present case. The *Caruso* case involved illegal gambling activities. There, federal agents, on the premises by virtue of a search warrant for stolen property, overheard, on an extension, a telephone caller ask defendant, "Are the results in for today?" and his response, "Call me back later." The agent then observed defendant in a rear bedroom at a desk with a telephone and an electric blender which was turned on. Strewn on top of the desk were racing forms, newspapers, and numerous slips of paper with numbers and figures written on them. About this time the telephone rang again and the agent heard the caller say, "This is 510. Give me 9–4–2 in the tenth. Are the results in for today?" The agent told the caller to check back in about five minutes. The agent then returned to the bedroom and saw scraps of paper in the liquid contents of the electric blender, but could not determine what had been written on them. The local police were notified and when they arrived they arrested defendant and seized the slips of paper and the racing publications.

The court upheld the seizure of the slips of paper, pointing out that when they seized the slips, the police knew from the agent the nature of the conversations heard over the telephone, the defendant was discovered in a back room near a telephone, they observed racing forms and newspapers in the room and numerous slips of paper with notations thereon, both on top of the desk and immersed in the blender. The court said that the inability of the police officers to identify positively the slips of paper as record evidence of bets did not render the seizure unlawful "where surrounding circumstances give rise to a reasonable belief that such slips of paper constitute evidence of a crime." 276 N.E.2d at 113.

In the *Caruso* case, the slips of papers were what was seized. The police could see they had notations on them, under circumstances that indicated illegal gambling was going on, and the slips in the electric blender were in process of being destroyed. Gambling paraphernalia is contraband and subject to seizure. The *Caruso* case is a clear case of seizure of evidence in plain view indicating criminal activity on the part of the defendant.

The case before us involves slips of paper, true, but not in the sense of the slips of paper seized in the *Caruso* case. It was not the slips of paper which were seized by Sgt. Morton. Morton seized a desk calendar pad which was not contraband and which as it lay in front of him did not indicate any criminal activity whatever on the part of defendant. What Morton could see of the desk calendar looked the same, regardless of whether the page for October 24 was missing or not. It was not until it was later discovered by searching through the pages that the page for October 24 was missing, that the calendar became incriminating. The incriminating part of the calendar was not in plain view, whereas the incriminating evidence seized in the *Caruso* case—the betting slips—was contraband and in plain view.

I do not believe the cases support the seizure of the desk calendar under the plain view theory here relied on. In *Schergen v. State*, 371 So.2d 575 (Fla.App.1979), defendant was convicted of possession of obscene materials. Armed with a search warrant authorizing a search of the premises for a particular film, "Knights of the Night—The Sling", the police entered the premises and set up film projectors and began to search for the specified film. In the process the officers screened a number of reels of film, all of which they seized as obscene, as well as eleven copies of the film described in the original warrant. The officers sought to justify the seizure of the films not described on the theory that they were in a place where they had a legal right to be and that the additional items seized were in plain view. The court, on appeal, reversed the conviction as to the additional films seized,

saying that the evidence should have been suppressed. The court held the plain view exception did not apply, saying at 371 So.2d 577: "If the objectionable contents of these films were truly in plain view, it would not have been necessary to remove them from their boxes and place them in a projector for viewing."

Similarly in the case before us, if the incriminating nature of the desk calendar were truly in plain view, it would not have been necessary to remove the calendar so that technician Cayton could search through it several days later after he had assembled the scraps of paper into a complete page to determine that the page in question was missing from the calendar.

For other cases illustrating the point that it takes more than for an object simply to be in plain view to make its seizure admissible, that such evidence is inadmissible where, as here, the incriminating nature of the evidence in plain view could be appreciated only by delving into the portions of the object seized which were not in plain view, see *People v. Hamilton*, 74 Ill.2d 457, 24 Ill.Dec. 849, 386 N.E.2d 53 (1979), a possession of heroin case, where the state offered various justifications for opening defendant's locked briefcase at the hospital where defendant had been taken for injuries when his car ran off the highway. The heroin was found in the brief case. The state sought to invoke the plain view doctrine. The court held to the contrary, saying at 24 Ill.Dec. 856, 386 N.E.2d 60: "In our case the officer had no authority to open [the] briefcase in which the defendant had an expectation of privacy. Had the briefcase been sitting open on the counter, with its contents in view, then the plain view exception would have applied. Here, however, the officer could only discover the evidence after opening the briefcase . . . The plain view exception is not applicable under the facts of this case."

Nor is it applicable in the case at bar, where the desk calendar was not open to the only place in the entire calendar which could constitute evidence against defendant.

See, also, *United States v. Jackson*, 576 F.2d 749 (8th Cir. 1978) (a prosecution for conspiracy relating to stolen securities in interstate commerce). When defendant was arrested in his office the agent seized a file drawer full of documents and a briefcase resting on top of the file cabinet. Later the FBI searched through the drawer and briefcase, finding two documents which were introduced at trial. The trial court admitted the evidence, on the plain view theory, saying the contents of the cabinet were visible without the need to open drawers and the briefcase was on top of the cabinet. On appeal, the Eighth Circuit held the evidence was illegally obtained, saying at 576 F.2d 753: "Although the file drawer and the brief case that the agent seized were perhaps in plain view, the contents of each were not. The plain view doctrine does not authorize search and seizure of items contained within objects like attache cases, file cabinets, and luggage that are themselves in 'plain view' . . . It [the plain view doctrine] cannot be used as justification for rummaging through file cabinets, even with probable cause to believe that incriminating evidence lies within . . ."

See, also, *People v. Denwiddie*, 50 Ill. App.3d 184, 8 Ill.Dec. 592, 597, 365 N.E.2d 978, 983 (1977) (an armed robbery conviction). Defendant was arrested in the living room of his studio apartment. One of the officers noticed near a couch a pair of shoes which appeared to contain some business cards. Hoping to identify another man who was found hiding in the bathroom and who was also arrested at the same time, the officer picked up the shoes and tilted them so that the cards fell out on a coffee table. The cards bore the name of Richard Steller, one of the robbery victims, whose wallet was taken in the robbery. On appeal the court held that the identification cards found in the shoes should have been suppressed, observing that the officer was not able to read the cards until he tilted the shoe and caused the cards to tumble onto the table. "The fact that Gerdes saw some cards in a shoe cannot justify their seizure

under the plain view doctrine where the criminal character of the evidence was not apparent on mere surface inspection . . ."

The state in the instant case has failed to prove that the absence of the page for October 24 from the desk calendar, as distinguished from the desk calendar itself, was in plain view or inadvertently discovered in the course of a search properly limited to the items named in the search warrant. Sgt. Morton would have had no right to riffle through the pages of the calendar as he stood by the telephone stand in defendant's home. The desk calendar could properly be considered private papers of the defendant, in which defendant was entitled to a reasonable expectation of privacy, particular when in his home. It was not properly subject to a warrantless examination of its contents. People frequently and customarily use calendars of the type before us as a record of events, transactions, memoranda and for notations of personal and business matters. The plain view doctrine does not give the officers the right to riffle through personal papers to locate information otherwise hidden from view.

The element of *Coolidge, supra,* that it be apparent to the police that they have evidence before them incriminating the defendant, "in essence, amounts to a requirement that police have probable cause to believe the evidence is incriminating before they seize it", *State v. Wilson,* 279 Md. 189, 367 A.2d 1223, 1227 (1977). On the same subject see *United States v. Gray,* 484 F.2d 352, 356 (6th Cir. 1973), *cert. den.* 414 U.S. 1158, 94 S.Ct. 916, 39 L.Ed.2d 110 (1974), stating: "[I]t must be 'immediately apparent' to the police that the object is in fact incriminating or the seizure of the object would be without probable cause and would turn the search into a general or exploratory one."

As earlier stated, Sgt. Morton had no explanation as to why he seized the desk calendar other than that it "might" be connected with the crime. This hunch or suspicion on his part, however, was not confirmed by actual observation of the desk calendar, because it could not be told by what he could see whether the page for October 24 was missing. It took a later investigation of the desk calendar at headquarters, to make the determination. Thus, it is clear that no probable cause existed to seize the calendar on the spur of the moment as Morton proceeded to do. It was physically impossible for the fact which would have made the desk calendar incriminating—the absence of the page for October 24—to have been "immediately apparent" to Sgt. Morton.

By reason of the erroneous admission of the desk calendar into evidence, I would reverse and remand for a new trial.