**STATE of Missouri,
Plaintiff-Respondent,**

v.

**Randall K. ESROCK,
Defendant-Appellant.**

No. 45826.

Missouri Court of Appeals,
Eastern District,
Division One.

Aug. 30, 1983.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Oct. 26, 1983.

Phyllis Weber, Clayton, John Ashcroft, Atty. Gen., Jefferson City, for plaintiff-respondent.

Harold M. Weber and James W. Whitney, Jr., St. Louis, for defendant-appellant.

SIMON, Presiding Judge.

Randall Esrock, defendant, appeals from a verdict finding him guilty of possession of a controlled substance and resisting arrest. Defendant was sentenced to five years imprisonment on the possession charge and one year on the charge of resisting arrest. The sentences were to run concurrently, but the trial court suspended the five year sentence.

On appeal, defendant contends that the trial court erred in holding that: (1) defendant's Fourth Amendment right against warrantless search and seizure was not violated; (2) a warrantless search of defendant's residence was permissible under the exigent circumstances exception; and (3) a warrantless search of defendant's residence was permissible under the consent exception. Essentially, the issue is whether the police officers' search of defendant's residence and the seizure of the marijuana violate his rights as guaranteed by the Fourth and Fourteenth Amendments. We affirm.

We review the evidence in a manner consistent with the ruling and verdict at the trial and disregard evidence and inferences to the contrary. On February 4, 1981, the St. Louis County Police Department received a 911 "hang-up" call. "911" is a law enforcement device whereby one dials 911 and is connected directly with a police dispatcher to inform the police of an emergency and request assistance. A "hang-up" call occurs when the person dialing 911 hangs up before communicating with the dispatcher. The police dispatcher testified that the procedure established for hang-up calls entails calling the telephone number of the caller, which is displayed to the dispatcher on a screen, and inquiring into the reason for the call. Whether the return call is successful or not, the name and address corresponding to the telephone number is obtained and police are dispatched to the location. The testimony did not reveal why a return call is made if police are to be dispatched in any event, nor did it reveal why police are dispatched after being told no emergency exists. It could be that the return call is aimed at discerning the nature of the emergency in order to provide adequate assistance. Further, police may be sent even if the dispatcher is told no emergency exists in the event that the person answering the return call is the perpetrator of a crime.

The police dispatcher testified that on February 4, 1981, she followed this procedure and talked to a person at the location who stated he was the only person at the location, no emergency existed, he had not dialed 911 and there was no need to send any officers. The dispatcher, in conformity with the procedure, sent two police officers to the location.

At trial, one of the officers testified that he and his partner arrived at the location, a residence, and rang the doorbell. Defendant answered and was asked if he had dialed 911 and if anyone else was in the house. He answered no. He was then asked who lived in the house. Defendant responded that he lived there with his father and brother. The officer testified that

defendant was speaking loudly and was barely coherent. They were concerned because defendant's mother had committed suicide at the home approximately a year before.

The officers inquired as to whether they could enter the home to determine if anyone was injured and defendant said, "yes, well come on in." After entering, the officers immediately began looking in the dining room, living room, kitchen, and a hallway. The testifying officer said moments later his partner asked him to come to a hallway. At this point defendant said, "this is my room and you can't go in there, besides there is less than an ounce of dope in there." From the hallway they looked into defendant's bedroom and could see "a pile of green vegetation sitting on a table" which they believed to be marijuana.

The officers informed defendant he was under arrest. Defendant responded by running away. The officers caught him in the kitchen where defendant began kicking and hitting them while yelling obscenities. He then stated he did not think they should be in the house, specifically stating they were not allowed in his room and he did not want them searching the house. Defendant was subsequently arrested, charged and tried.

■ Generally, a warrantless search or seizure is per se unreasonable under the Fourth and Fourteenth Amendments to the U.S. Constitution. *Katz v. U.S.,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). However, like many general rules, a trail of exceptions follow and negate the rule's applicability to a certain set of circumstances. The exceptions to the general rule above include consent, emergency (including hot pursuit), automobile, stop and frisk, border searches and plain view. Defendant's situation involves such a negation and activates, not one, but two exceptions, which are consent and plain view.

Defendant contends the police reaction to the 911 hang-up call lies at the center of his controversy and dominates the issue of whether the search and seizure was constitutionally valid, contending that it did not satisfy the emergency exception to the prohibition against warrantless searches.

The hang-up call is the reason that the officers went to the defendant's residence. It is not necessary to determine whether a 911 hang-up call in and of itself is sufficient justification for a warrantless search, i.e., whether a 911 hang-up call rises to the level of an emergency exception. *See, Michigan v. Tyler,* 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978) (where the court determined the parameters of a warrantless search under the emergency exception in the confines of a burning building.)

Here, in conformity with police procedure, officers were sent to the origin of the 911 hang-up call. This is a reasonable reaction to such a call. Rather than grant full credence to an assurance by the person answering the return call that no emergency existed and chance the commission of a crime or destruction of evidence, the police investigate on the premise that the person answering the call back could be the perpetrator of a crime or could be coerced by another to deny an emergency exists. Accordingly, we find the reaction to the 911 hang-up call to be a sufficient and adequate reason for the police to go to defendant's residence. This is preferred in the interest of public safety and effective law enforcement.

■ The record reveals that the search was consensual, and therefore is not prohibited by the rule forbidding a warrantless search. *State v. Blair,* 638 S.W.2d 739 (Mo. banc 1982). Although there is no requirement that the person consenting have knowledge of the right to refuse a warrantless search, the consent must be voluntary. Its voluntariness is to be determined by the totality of the circumstances surrounding the consent. *Blair,* at 750. Here, we find the consent to be voluntary. The police introduced themselves and informed the defendant of the reason for their presence. They asked defendant if they could search the house to determine if anyone was injured and defendant answered, "yes, well, come on in." There is no evidence that the police displayed any weapons, abused their

authority, utilized fraud, or misrepresentation to procure defendant's consent. Finally, defendant's conduct is consistent with a finding that he voluntarily consented to the search and did not object in any manner. *Blair*, at 750.

 Since we have concluded that defendant's consent was voluntarily given, we must determine the boundaries of the consensual search. The evidence reveals that the search was conducted in the dining room, the living room, the kitchen, and in a hallway. The bedrooms were inspected from the hallway. The officers' search was minimal. The areas searched were reasonable considering the purpose of the search, i.e., to see if anyone was injured.

 Having concluded the officers did not exceed the scope of the consensual search, we must look to the propriety of the discovery and the seizure of the controlled substance. We find that the discovery and seizure falls within the ambit of the plain view exception. *State v. Clark*, 592 S.W.2d 709 (Mo.banc 1979). Plain view alone is insufficient to justify a warrantless seizure. It is necessary that the evidence be observed in plain view by the officer in an area where he has a right to be. Further, the discovery of the evidence must be inadvertent and it must be apparent to the officer that he has evidence before him. *Clark*, at 713.

Our review of the record indicates that each of the requirements of the plain view exception have been satisfied. The police officer was rightfully in the hallway pursuant to the consensual search. The evidence seized was unknown to the officer before being observed in plain view from the hallway. The search was directed toward possible injuries to persons and was unrelated to any controlled substance. The police did not intend to seize the evidence prior to observing it in plain view. The officers testifying stated that when looking into the bedroom they noticed "a pile of green vegetation sitting on a table" which they believed to be marijuana. Further, the defendant stated, "besides there is less than an ounce of dope in there." From this the police had a reasonable belief that the evidence related to criminal activity.

Judgment affirmed.

STEPHAN and KAROHL, JJ., concur.